769 A.2d 1131

**Donald J. DUCHESS and Catherine A. Duchess, Appellees,**

**v.**

**LANGSTON CORPORATION, Appellant.**

Supreme Court of Pennsylvania.

Argued March 6, 2000.

Decided April 19, 2001.

---

530

Joseph J. Bosick, Pittsburgh, for Langston Corporation.

Michael T. Collins, Pittsburgh, for Donald & Catherine Duchess.

James M. Beck, for Product Liability Counsel (Amicus).

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

Appeal was allowed to determine whether evidence of a subsequent design change should be admissible in a strict products liability action to establish product defect.

On May 12, 1990, Appellee Donald J. Duchess ("Duchess") was injured while cleaning internal components of a machine manufactured by Appellant, Langston Corporation ("Langston"), which was sold to Duchess' employer, 4–M Manufactur-

ing, in June of 1988. In August of 1991, Duchess and his wife commenced the present civil action, asserting causes of action based upon theories of negligence and strict liability. Principally, they contended that the design of the machine was defective, because it lacked an interlock device to halt injurious moving parts upon the opening or removal of their covering guard or shield. Langston took the position that the machine's design was safe, but it admitted in answers to interrogatories to the incorporation of an interlock device at the pertinent location on newly-manufactured machines as of July, 1991, approximately one year after Duchess' accident. Langston filed a pre-trial motion seeking to bar the admission of evidence of this subsequent design change. The trial court initially deferred ruling but ultimately granted the motion, thus precluding the Duchesses from revealing to the jury Langston's subsequent integration of the interlock.

At trial, the Duchesses pursued only the strict products liability claim. Both parties offered detailed testimony describing the machine and its operation to apprise the jury how the accident occurred and provide necessary context for the Duchesses' claim and Langston's defenses. The Saturn III Flexo Folder Gluer and Die Cutter (the "Saturn III") fabricates corrugated board into finished boxes. Its seventy-foot length is divided into functional segments which, respectively, accept sheets of corrugated cardboard; add printed material according to customer specifications; score and slot the cardboard; place strips of glue; fold; and count finished boxes. A main drive powers a conveyor system guiding the materials through the process, and auxiliary motors drive specific functional sections, with various controls positioned throughout, including three "emergency stop buttons" that primarily affect the main drive, and a single main disconnect switch controlling power to all components.

Duchess was injured on one of two portions of the Saturn III dedicated to flexography, a printing method that utilizes fast-drying ink. The components of this segment are inaccessible during normal operations, but, during cleaning, the sections are separated to permit access. Upon division, a hinged

ink shield is exposed, which may be opened or removed to reveal the printing components, including an engraved, inking roll carrying a trade name of "anilox";[1] a wiper roll; a print cylinder, to which the actual printing elements are attached; and an impression cylinder. The anilox and wiper rolls operate in tandem, both turning inward toward a point of contact called a "nip point"; the wiper roll is powered by an auxiliary motor, whereas the anilox roll is not independently powered but operates dependent upon friction resulting from contact with the wiper roll. Functionally, printing is accomplished by funneling liquid ink into the nip point between the anilox and wiper rolls, where it forms a reservoir, with the operator manipulating the proximity of the rolls to adjust flow and, correspondingly, print quality. Minute engravings in the anilox roll capture miniscule quantities of ink, which is transferred to the printing elements in measured amounts. Apparently, the rolls turn in relative silence; however, a green light on the side of the print section illuminates during operation.

Duchess testified that his injuries occurred after he had placed his hand into the opening to adjust a water spray nozzle, part of an automated cleaning system, located above the wiper roll. He indicated that he had depressed an emergency stop button, which he believed would de-energize all of the Saturn III's moving components; he further stated that his observation that the anilox roll was stationary seemed to confirm this belief.[2] According to Duchess, he had separated the anilox and wiper rolls to facilitate cleaning; he was unaware that the wiper roll was powered by an auxiliary motor that was not affected by the emergency control employed; and he was also unaware of the control relationship between the anilox and wiper rolls (i.e., that, if separated, the wiper roll could be turning although the anilox roll was not). Duchess also suggested that the green light that indicated

1.  The parties have referred to the inking roll by its trade name throughout the record and in their briefs; we follow this convention for the sake of convenience.

2.  The anilox roll apparently would at least partially obstruct an operator's line of sight from the access location to the wiper roll.

operation of the wiper roll was not readily visible to him.[3] Duchess' gloved left hand touched the rotating wiper roller and was drawn into the nip point; the resulting injuries required amputation of his ring and small fingers, as well as a segment of his middle finger.

In addition to providing such background, the Duchesses offered testimony from a liability expert, a mechanical engineer, to support their claim that the absence of an interlock device at the ink shield location constituted a design defect. The expert described the operation of an interlock, indicating that such devices are frequently used in common appliances, such as residential washing machines and dryers, and expressed the opinion that its integration into the Saturn III's ink shield was necessary to render the machine safe. Langston expressly conceded that an interlock was feasible, but it limited this concession to an admission that the design change would have been technologically possible at the time the Saturn III was sold to Duchess' employer. Langston then presented evidence and argument to the effect that the change was impractical because: the location of the components at a site that is inaccessible during normal operations, as well as easily-applied precautions to be taken during setup and cleaning, were sufficient to ensure reasonable safety; access to the printing components while active was necessary to make adjustments to the ink flow during set-up, and therefore, proper printing would be precluded by the introduction of a print-shield interlock; and interlock devices have the potential disadvantage of functioning as an inappropriate "reliance mechanism," which operators may come to utilize in place of proper safety measures. Although the Duchesses argued that Langston's strategy opened the door to the admission of the evidence of subsequent incorporation of an interlock (since evidence of subsequent remedial measures may generally be admitted where feasibility is contested, *see* Pa.R.E. 407 (see

---

**3.** At trial, Langston offered a different account of the events preceding the accident, which suggested that Duchess, a trained and at least moderately experienced operator, was or should have been aware of the workings of the Saturn III but had carelessly ignored safety protocols to expedite the cleaning operations.

generally *infra* note 9)), the trial court agreed with Langston's position distinguishing feasibility from practicality, observing that Langston "had not taken the position that adding an interlock was not capable of being carried out."

At the conclusion of trial, the jury received special interrogatories, the first of which inquired whether the lack of an interlock device on the ink shield of the Saturn III constituted a design defect. The jury answered in the negative, resulting in a verdict in favor of Langston, and the trial court denied post-trial motions.

On appeal, a divided panel of the Superior Court reversed and awarded a new trial in favor of the Duchesses based, *inter alia*, on the conclusion that the trial court erred in failing to allow them to introduce evidence of the subsequent design change to the Saturn III. *See Duchess v. Langston Corp.*, 709 A.2d 410 (Pa.Super.1998).[4] The majority opened its analysis by acknowledging the evidential principle that proofs related to subsequent repair are generally inadmissible in a negligence action. *See Duchess*, 709 A.2d at 412–13 (citations omitted). Citing to *Matsko v. Harley Davidson Motor Co.*, 325 Pa.Super. 452, 473 A.2d 155 (1984), in which the Superior Court had ruled that the common law subsequent repair rule was inapplicable in a products liability case, *see id.* at 456–61, 473 A.2d at 157–59, the majority described the underpinnings of this "subsequent repair" rule as twofold. First, since the central question in a negligence action is the reasonableness of the defendant's actions in relation to the applicable duty of care measured as of the time of the accident, subsequent repairs are not relevant, as they may be occasioned by a new and potentially different set of circumstances and/or corresponding duties prevailing at the later time. *See Duchess*, 709 A.2d at 413 (stating that "actions taken with hindsight are not probative of actions taken without such hindsight"). Second, the majority recognized that the prohibition of evidence of

4. The Superior Court also held that the trial court erred in excluding evidence derived from the Saturn III operators' manual as irrelevant. *See Duchess*, 709 A.2d at 412. Appeal was not allowed to reexamine the Superior Court's conclusion in this regard.

subsequent remedial measures is grounded in social policy, the central concern being that allowing its admission might discourage repairs or alterations that would enhance safety or otherwise constitute improvements, since, if the rule were otherwise, the fact of any such change could be employed adversely in a future tort action. *See id.* at 413. *See generally Matsko,* 325 Pa.Super. at 456, 473 A.2d at 156 (stating that " '[m]anufacturers should not be inhibited in, or prejudiced by, a good faith effort to protect the public safety and comply with their statutory duty' " (citation omitted)).

According to the Superior Court majority, neither of these justifications applies in the strict liability area. Whereas the majority had indicated that evidence of subsequent repairs was not relevant in a negligence action, it found such evidence directly relevant in a strict liability action, since in this form of action the pertinent question does not concern the defendant's conduct, but rather, the character of the product. *See Duchess,* 709 A.2d at 413 (citing *Matsko,* 325 Pa.Super. at 455–56, 473 A.2d at 156–57). Further, the majority reasoned that the public policy justification was inapplicable in strict liability cases, as manufacturers would not be deterred from making safety repairs to their products merely because evidence of subsequent remedial measures was deemed admissible. Quoting indirectly from a landmark decision of the California Supreme Court in *Ault v. International Harvester Co.,* 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1974), the majority stated:

The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the [subsequent repair rule] . . . does not affect the primary conduct of the mass producer of

goods, but serves merely as a shield against potential liability. In short, the purpose for the [subsequent repair rule] is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field.

*Id.* at 413, 117 Cal.Rptr. 812, 528 P.2d 1148 (quoting *Matsko,* 325 Pa.Super. at 457, 473 A.2d at 157 (quoting *Ault,* 117 Cal.Rptr. 812, 528 P.2d at 1151–52)). The majority acknowledged the Superior Court's prior decisions in *Gottfried v. American Can Co.,* 339 Pa.Super. 403, 489 A.2d 222 (1985), and *Connelly v. Roper Corp.,* 404 Pa.Super. 67, 590 A.2d 11 (1991), which indicate that design improvements made after the sale of a product are not relevant to the question of its defectiveness and suggest that the holding of *Matsko* should be limited to post-accident, product recalls;[5] nonetheless it determined that *Gottfried* and *Connelly* should themselves be limited to the proposition that subsequent design changes cannot be introduced to establish the state of the art at the time a product was manufactured. *See Duchess,* 709 A.2d at 414. As state of the art was not in issue in the case at bar, however, the majority held that:

**5.** *Connelly* states as follows:

In *Gottfried,* we determined that where the product involved was manufactured and sold in 1977, it was irrelevant that in 1980 the product had safety features not present in the 1977 product. We concluded that design improvements made after the sale of the product are not relevant to the issue presented in a products liability case, which is whether the product was safe when sold. *Compare Leaphart v. Whiting Corp.,* 387 Pa.Super. 253, 564 A.2d 165 (1989) (issue did not involve design changes, but post-sale repair work performed on the unit that actually injured the plaintiff); *Matsko v. Harley Davidson Motor Co.,* 325 Pa.Super. 452, 473 A.2d 155 (1984) (issue was not design changes to the unit, but post-accident manufacturer recall of the unit which injured plaintiff).

In the present case, appellants were not prevented from showing that the relevant safety features were available in 1968. This was brought out on cross-examination and during their case-in-chief. The only limitation imposed by the trial court was that appellants could not question the expert concerning design changes made after the 1968 sale date. This limitation was imposed properly under our decision in *Gottfried.*

*Connelly,* 404 Pa.Super. at 70–71, 590 A.2d at 13.

the evidence showed that appellee chose to produce an item which was not as safe as it could have been considering *the state of the art at the time of production.* The fact that appellee later incorporated the interlock was a subsequent repair that should have been admitted in this products liability action under the general rule announced in *Matsko.* *Duchess,* 709 A.2d at 414 (emphasis in original). Further, the majority concluded that, once Langston's expert questioned the practicality of the interlock, the Duchesses should have been permitted to show that the interlock had been incorporated on the Saturn III. *See id.* at 414–15.

In a dissenting opinion, Judge Del Sole concluded that evidence of a subsequent design change was irrelevant in the strict liability setting, as it is in the negligence area, since defectiveness in strict liability, like the defendant's conduct in negligence, is judged in relation to an earlier time frame. *See Duchess,* 709 A.2d at 416 (Del Sole, J., dissenting). The dissent noted that the Duchesses had adduced extensive evidence concerning the availability of interlock technology at the time Duchess' employer acquired the Saturn III, further diminishing the relevance of the subsequent change. The dissenting opinion also tracked *Connelly* in distinguishing *Matsko* on the basis that it involved a post-accident recall rather than a design change. *See id.* at 416 (noting that, although the majority described Langston's design change as a "subsequent repair," "the true facts establish that there was no subsequent repair to the machine, but instead a subsequent change in product design"). According to the dissent, *Connelly's* holding should be deemed controlling, such that, "where a plaintiff establishes that relevant safety features were available at the time of a product's sale, subsequent design improvements made after the sale of the product are not relevant on the question of the existence of a defect in a products liability case." *See id.*

In this appeal, Langston argues that the Superior Court's holding is contrary to long-recognized policies underlying the basic prohibition of the admissibility of subsequent remedial changes; the fundamental tenet of Pennsylvania strict prod-

ucts liability law requiring that the alleged defectiveness of the product be assessed as of the time it left the hands of the manufacturer; and the Superior Court's own precedent in *Gottfried* and *Connelly*. Langston contends that the evidence is unduly prejudicial because jurors may place excessive weight on the fact of the design change, perhaps going so far as to view it as an admission that the product was defective. Indeed, according to Langston, the potential for diverting the jury's attention is so great that a rule of liberal admissibility would effectively expand the substantive scope of Pennsylvania's strict liability scheme. The Duchesses, on the other hand, agree that the evidence can be quite powerful, but endorse the rationale of the Superior Court majority, the *Matsko* panel, and the *Ault* court that the relevance and social policy justifications underlying its exclusion are inapt in the strict liability setting. Although acknowledging that *Gottfried* and *Connelly* are in some respects to the contrary, the Duchesses contend that those cases were wrongly decided. They maintain that such post-injury remedial measures as were available at the time of manufacture, and would render the product in question safer for consumer use, are highly relevant to, and indeed dispositive of, the core issue in a strict products liability case.

As noted by the Superior Court, the common law of Pennsylvania, like that of most other jurisdictions, embodies the common law "subsequent repairs" doctrine, which excludes evidence of subsequent remedial measures, at least when such evidence is offered to establish fault or culpable conduct. This doctrine is the antecedent to Pennsylvania Rule of Evidence 407, entitled "Subsequent Remedial Measures," which provides as follows:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove that the party who took the measures was negligent or engaged in culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for impeachment or to

prove other controverted matters, such as ownership, control, or feasibility of precautionary measures.

Pa.R.E. 407.[6] Citing to *Baron v. Reading Iron Co.*, 202 Pa. 274, 51 A. 979 (1902), the rule's comment highlights its consistency with the common law doctrine precluding the use of evidence of subsequent remedial measures to prove fault or negligence. In describing the application of the general rule in the negligence setting, *Baron* touches upon the traditional justifications: the exclusion of evidence that lacks relevance, and the promotion of salutary social policy objectives.[7] In the latter regard, the aim is to encourage measures that further necessary or added safety, or at least to avoid discouraging such measures, by removing the concern that they will be employed adversely in an action at law. *See generally Raymond v. Raymond Corp.*, 938 F.2d 1518, 1523 (1st Cir.1991) (stating that "[i]f subsequent safety improvements to a product could be used as evidence that prior models were defec-

---

6. While Rule 407 was not in effect at the time of trial in the present case, it serves as a useful reference, since it reflects the common law rule. Accordingly, the general discussion below is framed around Rule 407.

7. According to *Baron*,

> [t]he admission of [evidence of subsequent remedial measures] cannot be defended on principle. It is not more likely to show that there was negligence before the accident than that the occurrence of the accident first suggested the use of methods or appliances not before thought of; it applies to conduct before an accident a standard of duty determined by after-acquired knowledge; it punishes a prudent and well-meaning defendant who guards against the recurrence of an accident he had *no reason to anticipate*, or who out of a considerate regard for the safety of others exercises a higher degree of care than the law requires.

*Baron*, 202 Pa. at 284, 51 A. at 980; *see also Columbia & Puget Sound RR Co. v. Hawthorne*, 144 U.S. 202, 207–08, 12 S.Ct. 591, 592–93, 36 L.Ed. 405 (1892) (stating that "[such] evidence is incompetent, because the taking of such precautions against the future is not to be construed as an admission of responsibility for the past, has no legitimate tendency to prove that the defendant had been negligent before the accident happened, and is calculated to distract the minds of the jury from the real issue, and create a prejudice against the defendant"). *See generally Hyjek v. Anthony Indus.*, 133 Wash.2d 414, 944 P.2d 1036, 1037–38 (1997) (characterizing the rule as "a rejection of the notion that 'because the world gets wiser as it gets older, therefore it was foolish before'") (quoting *Hart v. Lancashire & Yorkshire Ry. Co.*, 21 L.T.R. (n.s.) 261, 263 (Exe.1869)).

tively designed, this would discourage manufacturers from continuing to update and improve upon the safety features of their products after initial manufacture"). While the federal counterpart to Pennsylvania Rule of Evidence 407 also relies upon these considerations to support extension of the rule's prohibition to the admission of evidence of subsequent remedial measures offered to establish a defect in a product or its design (or necessity for a warning or instruction), *see* F.R.E. 407; *see also* JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 407.03 (Joseph M. McLaughlin ed., 1998),[8] the Pennsylvania rule is silent in this regard, with the accompanying comment expressly leaving the question open for resolution in the decisional law.

Significantly, the development of the common law subsequent repair rule occurred prior to the advent of modern mass production, and its first applications therefore occurred in the setting of true repairs in the definitional sense of the word. *See, e.g.,* WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed.1999) (defining the act of "repair" as: "to put back in good condition after damage, decay, etc.; mend, fix"). Thus, the classic cases involved, for example, repairs by a railroad

8. The federal advisory committee note indicates a preference for the public policy rationale.

The express extension of the rule to strict liability was added by amendment effective in December of 1997, prior to which time a substantial majority of federal courts already had adopted this approach. *See Wood v. Morbark Indus., Inc.,* 70 F.3d 1201, 1206–07 (11th Cir.1995); *Kelly v. Crown Equip. Co.,* 970 F.2d 1273, 1276 (3d Cir. 1992); *Raymond,* 938 F.2d at 1522–23; *Gauthier v. AMF, Inc.,* 788 F.2d 634, 636–37, *amended,* 805 F.2d 337 (9th Cir.1986); *Flaminio v. Honda Motor Co.,* 733 F.2d 463, 468–72 (7th Cir.1984); *Grenada Steel Indus., Inc. v. Alabama Oxygen Co.,* 695 F.2d 883, 888 (5th Cir.1983); *Hall v. American S.S. Co.,* 688 F.2d 1062, 1066–67 (6th Cir.1982); *Cann v. Ford Motor Co.,* 658 F.2d 54, 60 (2d Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2036, 72 L.Ed.2d 484 (1982); *Werner v. Upjohn Co.,* 628 F.2d 848, 858 (4th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981). *See generally Hyjek,* 944 P.2d at 1039 & nn. 6–7 (citing cases). Only the Eighth and Tenth Circuits questioned the rule, or abided by a contrary one, prior to the amendment. *See Huffman v. Caterpillar Tractor Co.,* 908 F.2d 1470, 1480–81 (10th Cir.1990) (superceded by F.R.E. 407, as amended); *Burke v. Deere & Co.,* 6 F.3d 497, 506 (8th Cir.1993) (same), *cert. denied,* 510 U.S. 1115, 114 S.Ct. 1063, 127 L.Ed.2d 383 (1994).

company to existing tracks on which an accident had occurred. *See Lancashire & Yorkshire Railway*, 21 L.T.R. (n.s.) at 263. Over time, however, the subsequent repairs rule was not so closely limited, and "[a]t common law, the courts analyzed many different remedial actions under the rubric of 'repairs.'" LEONARD PACKEL AND ANNE BOWEN POULIN, PENNSYLVANIA EVIDENCE § 407–1, at 242 (West 1999). Accordingly, courts began to describe the doctrine as the "subsequent remedial measures rule," to reflect its broader application to, for example, post-accident warnings, safety precautions and changes in procedure. *See, e.g., Baron*, 202 Pa. at 282, 51 A. at 979 (holding the doctrine applicable to bar the admission of evidence, including testimony concerning the implementation of post-accident changes in procedure). *See generally* 63 AM. JUR.2D PRODUCTS LIABILITY § 498 (1996). With the advent of strict products liability theory, and the increasing prevalence of tort cases predicated upon claims of design defect, new questions arose as to whether the policies informing application of the rule in the negligence setting applied equally in cases that did not involve fault or culpable conduct in the traditional sense.

In the present case and in *Matsko*, the Superior Court followed the example of *Ault* to diverge from the federal model by refusing to extend the prohibition against evidence of subsequent remedial measures to strict liability claims, concluding that the logic underlying application of the rule of exclusion in the negligence setting is inconsistent with strict liability theory.[9] As the Superior Court majority noted, the

---

**9.** A substantial number of state jurisdictions have also taken this approach. *See, e.g., Forma Scientific, Inc. v. Biosera, Inc.*, 960 P.2d 108, 115 (Colo.1998); *McFarland v. Bruno Machinery Corp.*, 68 Ohio St.3d 305, 626 N.E.2d 659, 664 (1994); *General Motors Corp. v. Moseley*, 213 Ga.App. 875, 447 S.E.2d 302, 310 (1994), *overruled on other grounds, Webster v. Boyett*, 269 Ga. 191, 496 S.E.2d 459, 463 (1998); *Ford Motor Co. v. Fulkerson*, 812 S.W.2d 119, 126 (Ky.1991); *Sanderson v. Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 491 A.2d 389, 396 (1985); *Jeep Corp.*, 708 P.2d at 302; *Friederichs v. Huebner*, 110 Wis.2d 581, 329 N.W.2d 890, 907–08 (1983); *Caldwell v. Yamaha Motor Co.*, 648 P.2d 519, 524 (Wyo.1982). On the other hand, the jurisprudence of many other states parallels the federal model as embodied in Federal Rule of Evidence 407. *See, e.g., Hyjek*, 944 P.2d at 1042–43; *Cyr v. J.I. Case*

*Ault* rationale is grounded initially in the theoretical distinction between negligence and strict products liability, principally, the precept that negligence turns upon conduct, whereas the elements of a strict products liability claim focus upon the condition of the product at issue. *See generally Ault,* 117 Cal.Rptr. 812, 528 P.2d at 1152; *Jeep Corp. v. Murray,* 101 Nev. 640, 708 P.2d 297, 302 (1985) (holding that the bar against the admission of evidence of subsequent remedial measures "comes into play only where negligence or other 'culpable' conduct is alleged"). While courts applying the *Ault* rationale generally do not dispute the proposition, advanced in *Baron* and its progeny, that a subsequent remedial measure does not bear directly upon a defendant's conduct, such courts have viewed the relevance of remedial measures as enhanced when the dispositive inquiry shifts from the question of fault to whether the product is defective. *See Caldwell,* 648 P.2d at 524 (reasoning that, since due care or culpability is not an issue in a strict liability action, the exclusionary rule was not applicable).[10] Additionally, the Superior Court adopted the *Ault* position concerning Rule 407's public policy rationale— that, in the modern marketplace, economic factors provide adequate motivation for mass producers to improve their defective products, such that the incentive provided by the exclusionary rule is unnecessary or irrelevant.[11]

*Co.,* 139 N.H. 193, 652 A.2d 685, 693 (1994); *Krause v. American Aerolights, Inc.,* 307 Or. 52, 762 P.2d 1011, 1013 (1988); *Kallio v. Ford Motor Co.,* 407 N.W.2d 92, 97–98 (Minn.1987); *Rix v. General Motors Corp.,* 222 Mont. 318, 723 P.2d 195, 202 (1986); *Hallmark v. Allied Products Corp.,* 132 Ariz. 434, 646 P.2d 319, 325–26 (1982). *See generally* Annotation, *Admissibility of Evidence of Subsequent Repairs or Other Remedial Measures in Products Liability Cases,* 74 A.L.R.3d 1001, § 13 (Supp.2000).

**10.** These courts generally cite to the liberal policy of admission under Federal Rule of Evidence 401 or its state-law equivalent. *See, e.g., Forma Scientific,* 960 P.2d at 118.

**11.** *See also Forma Scientific,* 960 P.2d at 115–16 (stating that "[i]t is unreasonable to presume that a mass manufacturer of goods takes its cue from evidentiary rules rather than considerations of consumer safety and/or the safety of consumer property[;] ... market forces generally operate to compel manufacturers to improve their products"); *Herndon v. Seven Bar Flying Serv., Inc.,* 716 F.2d 1322, 1325 (10th Cir.1983) (reiterating the notion that "it would be unrealistic to think a

The Superior Court did not, however, in the present case or in *Matsko,* address the substantial body of criticism that has been leveled against *Ault's* reasoning, including the assertions that: 1) courts applying *Ault* overstate the relevance of subsequent remedial measures to a strict liability claim and underemphasize the potential for confusion and prejudice that the evidence creates; 2) pertaining to the public policy consideration underlying the exclusionary rule, *Ault's* focus upon mass producers is unsound; and 3) *Ault's* analysis concerning the impact of a rule of liberal admissibility upon implementation of remedial measures is flawed, particularly to the extent to which it attempts to distinguish negligence and strict liability theory.

First, regarding the relevance concern, consistent with the position taken by the Superior Court dissent, courts have emphasized the precept of strict liability theory that a product's safety be adjudged as of the time that it left the manufacturer's hands. *See generally* RESTATEMENT (SECOND) OF TORTS § 402(a) (1965).[12] Since the employment of a subsequent remedial measure by definition occurs in a different time frame, the evidence is said to be of diminished relevance. *See Grenada Steel,* 695 F.2d at 887 (stating that "evidence of subsequent repair or change has little relevance to whether the product in question was defective at some previous time"); *see also Wood,* 70 F.3d at 1206 ("Rule 407 is necessary in [design defect] cases to focus the jury's attention on the product's condition or design at the time of the accident"). It

tortfeasor would risk innumerable additional lawsuits by foregoing necessary design changes simply to avoid the possible use of those modifications as evidence by persons who have already been injured") (superceded by F.R.E. 407), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984).

Courts taking this position have also opined that insurers would object if their insured manufacturers refused to undertake remedial measures, *see Herndon,* 716 F.2d at 1328; that both governmental agencies and juries contemplating damage claims serve as a sufficient deterrent to a manufacturer's possible decision not to repair, *see id.;* and that "there is no evidence which shows that manufacturers even know about the evidentiary rule or change their behavior because of it." *Id.*

12. The Restatement (Third) of the Law of Torts: Products Liability also follows this approach. *See* RESTATEMENT (THIRD) OF TORTS § 2 (1997).

also has been noted that manufacturers may modify product design for many reasons other than to remedy a defect. *See Hyjek*, 944 P.2d at 1037. In light of both these concerns, some courts have expressed the view that evidence of subsequent remedial measures threatens to confuse the jury, both by diverting its attention from whether the product was defective at the relevant time to what was done later, *see Werner*, 628 F.2d at 857, and by facilitating, in the minds of jurors, an inappropriate equation between subsequent design modification and an admission of a prior defective design. *See Raymond*, 938 F.2d at 1523. Indeed, concluding that the latter risk is substantial, some courts and commentators have indicated that a rule of liberal admissibility is tantamount to an alteration of the scope of substantive products liability law. *See, e.g., Hyjek*, 944 P.2d at 1042.

Second, as noted, the soundness of *Ault's* focus on mass producers has been questioned, since the logic is premised on the projected behavior of large manufacturers, but the general rule of admissibility is extended to cases involving defendants of all character. *See, e.g., Cyr*, 652 A.2d at 693 (arguing that the *Ault* rationale "discounts the possible effect of an evidentiary exclusion rule on the thousands of small manufacturers doing business in this country, whose 'long-term prospects become highly suspect when faced with the losses of a single short-term products liability suit' " (citation omitted)). Moreover, if the manner or scale of production were the guiding criterion and favored a liberalized rule of admissibility, it would follow that such rule should apply equally to negligence cases involving mass manufacturers. *See Hyjek*, 944 P.2d at 1040 (indicating that the mass producer rationale is based in fallacy, since the argument has equal force in negligence actions); *see also Werner*, 628 F.2d at 858 (asserting that an exception for mass producers could "effectively override Rule 407 since its reasoning that evidence of subsequent precautionary measures is admissible in products liability cases might apply with equal force to a negligence cause of action"). Few jurisdictions, however, have eliminated the common law rule entirely.

Third, courts extending the exclusion of remedial measures to the strict products liability area generally reject *Ault's* estimations concerning the extent to which implementation of remedial measures by mass producers may be affected by the scope of an evidential rule. In this regard, it has been stated that *Ault* inappropriately premises its conclusions concerning manufacturer conduct upon the assumption that the product at issue is in fact defective, overlooking the situation where the product is not defective but could have been, and may be later, improved.[13] More centrally, courts have reasoned that, particularly as relates to claims of defective design, relevant differences between negligence and strict liability at both the theoretical and practical levels are marginal. *See, e.g., Cann,* 658 F.2d at 60 (stating that "although negligence and strict products liability causes of action are distinguishable, no distinction between the two justifies the admission of evidence of subsequent remedial measures in strict liability actions"); *Flaminio,* 733 F.2d at 469 (dismissing the *Ault* distinction between negligence and strict liability in relation to Rule 407 as "purely semantic"). As to theory, it is argued that, since design defect cases employ risk-utility balancing similar to that utilized in evaluating negligence claims, the concerns for excluding irrelevant and misleading evidence, as well as the public policy concern of not deterring safety, apply equally to claims based upon design defect and negligence.[14] At the

---

**13.** *See, e.g., Werner,* 628 F.2d at 857 (noting that "[t]he manufacturer who undertakes precautionary measures in this setting will face the risk of liability for an injury caused by an earlier nondefective version of the product based on evidence of his subsequent act which made the product safer but in no way supports an inference that the initial version of the product was defective").

**14.** Judge Richard Posner's comments in *Flaminio* exemplify this analysis:

Strict liability is something of a misnomer in products cases. There is liability only if a product is defective or unreasonably dangerous, and the concepts of 'defect' and 'unreasonableness' bring into play factors of cost and risk similar to those that determine negligence, an objective standard that is independent of what the particular defendant knew or could have done.

* * *

The analysis is not fundamentally affected by whether the basis of liability is the defendant's negligence or his product's defectiveness or

practical level, courts have emphasized that, regardless of the theory employed to require a manufacturer to pay damages, the deterrent to taking remedial measures is the same, namely, the fear that the evidence may ultimately be used against the defendant.[15] Thus, contrary to *Ault's* conclusions, the policy considerations supporting the exclusionary rule in the negligence setting have been viewed as also applicable in strict products liability actions (or at least those based on the assertion of defective design), notwithstanding the differing focuses.

Having considered the arguments on both sides of the question, we conclude that the federal approach, extending the

inherent dangerousness. In either case, if evidence of subsequent remedial measures is admissible to prove liability, the incentive to take such measures will be reduced.

*Flaminio,* 733 F.2d at 467, 470 (citing *Birchfield v. International Harvester Co.,* 726 F.2d 1131, 1139 (6th Cir.1984)) (citations omitted); *see also Krause,* 762 P.2d at 1013 (stating that "the difference between negligence and the fault at issue in a products liability case is not so significant as to call for a different interpretation of [Rule] 407"); *Gauthier,* 788 F.2d at 637 (noting that "there is no practical difference between strict liability and negligence in defective design cases and the public policy rationale to encourage remedial measures remains the same"). *See generally Johnson v. John Deere Co.,* 935 F.2d 151, 155 (8th Cir.1991) (citing cases and commentary for the proposition that negligent design and strict liability cases are essentially identical relative to the policy and effect of Rule 407).

15. *Grenada Steel* expresses this point as follows:

[T]he focus must be on the realistic implications of applying the exclusionary rule in strict products liability cases. From a defendant's point of view, it does not matter what kind of action the plaintiff brings. Rather, the manufacturer's focus will be on the fact that if it makes any repairs or safety improvements to its product, evidence of those repairs may be used at trial to show the product was defectively designed. Thus, failing to apply the exclusionary rule in strict liability actions will have the same deterrent [e]ffect on subsequent remedial measures as in a negligence case.

*Hyjek,* 944 P.2d at 1041; *Werner,* 628 F.2d at 857 (opining that "[t]he reasoning behind this asserted distinction [by *Ault* ] we believe to be hypertechnical, for the suit is against the manufacturer, not against the product"); *Cann,* 658 F.2d at 60 ("[s]ince the policy underlying Rule 407 not to discourage persons from taking remedial measures is relevant to defendants sued under either theory, we do not see the significance of the distinction[;][a] potential defendant must be equally concerned regardless of the theoretical rubric").

general rule excluding evidence of subsequent remedial measures to claims asserting product defect, represents the better view. As to relevance, following the Restatement approach, our jurisprudence requires that products are to be evaluated at the time of distribution when examining a claim of product defect. *See Davis v. Berwind Corp.*, 547 Pa. 260, 267, 690 A.2d 186, 190 (1997). Thus, evidence of a defendant's later conduct is not directly relevant, but, at best, can provide an inference concerning the product's earlier condition. We acknowledge, however, that, where such an inference is possible and permissible, the evidence supporting it would generally satisfy the standard of relevancy established by our evidential rules. *See generally* Pa.R.E. 401 (providing that " 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

Nevertheless, our rules, in appropriate circumstances, also call for an evaluation of the probative value of evidence in relation to the danger of unfair prejudice, confusion of issues or misleading the jury. *See* Pa.R.E. 403. The admission of evidence of subsequent remedial measures implicates all of these concerns, since, although their relevance may be limited, remedial measures can be viewed by jurors as suggesting an effective concession on the part of a manufacturer that its product, in an earlier form, was defective. Arguments presented to this Court amply illustrate this danger, as the Duchesses contend, as presumably they would to a jury, that, "[w]hen the dust settles and the smoke clears, ... evidence of subsequent remedial measures in a strict products liability action is the one piece of evidence that is truly dispositive of product defect." Thus, and as reflected in the cases and commentary, this form of evidence has the potential to be essentially dissected from the facts and circumstances in which the remedial measures were effectuated, and highlighted to jurors as controlling, thereby diverting their attention from relevant considerations concerning the condition of the product as it existed at the time it left the manufacturer's

control, and the associated risk and utility as also measured against the appropriate time frame. *See supra.*

Even so, it would be possible to relegate the Rule 403 weighing function to our trial judges, in the first instance, to apply in individual cases, allowing the use of the evidence where its prejudicial impact may be kept in proper balance, and excluding it where this is not possible. Indeed, absent consideration of the pertinent social policy concerns, this might be the preferable course.[16] We find, however, that the policy considerations also militate in favor of the general rule of exclusion and tip the balance in its favor.

In this regard, preliminarily, we reject *Ault's* mass producer logic for the reasons identified by *Ault's* critics, as it addresses only a segment of strict liability claims and, if controlling, would equally support removal of Rule 407's proscriptions from the negligence arena. *See supra.* Certainly, we are not inclined to abandon our recently adopted rule as it pertains to claims of negligence, since no argument has been presented in favor of doing so, and the rule is firmly grounded in common law and public policy.

More fundamentally, we are unable to meaningfully distinguish claims asserting negligent design from those asserting a design defect in terms of their effect on the implementation of remedial measures and/or design improvements in the marketplace. We are, of course, no better equipped than the *Ault* court to predict the precise conditions in which such changes will occur, given that they may be based upon a diverse and perhaps complex range of information, business concerns and economic factors.[17] However, the facility with which the fact

---

**16.** Notably, however, the balance between relevancy and potential prejudice appears to have been advanced as an independent ground for the general exclusion of subsequent repairs evidence in the negligence context. *See generally Baron,* 202 Pa. at 284, 51 A. at 980; *see also Columbia & Puget Sound,* 144 U.S. at 207–08, 12 S.Ct. at 592–93.

**17.** *Grenada Steel* articulates this practical limitation in this fashion:

A priori judgments concerning why manufacturers do or do not alter their products, made by such dubious experts as judges, lawyers, and law professors, suffer from excessive reliance on logical deduction and surmise without the benefit of evidence of industry practice or

of such changes may be employed as a weapon against the manufacturer, and the potential potency of such evidence, are relevant considerations in this mix, at least to the same extent as they are in the negligence setting. Since the importance of the social policy objectives sought to be advanced is unquestionable, the prospect of our rules inhibiting such policy and, correspondingly, the continual process of improvement and innovation in the marketplace, favors the broader application of the evidentiary exclusion. We also note that *Ault's* categorical statements that presume product defect in predicting the conduct of mass producers appear to overlook subtleties and uncertainties associated with both litigation of the issue of product defect and the decisionmaking process employed in the business community.[18] Additionally, although perhaps overstated in some decisions (at least as it relates to Pennsylvania jurisprudence), there are analytical similarities between strict liability and negligence in relation to claims of defective design, and we agree with those courts that have concluded that no distinction between the two justifies differential treatment in relation to Rule 407. *See supra* notes 13–14 and accompanying text.

> economic factors. It seems to us, with no greater expertise than like-trained lawyers and judges, that changes in design or in manufacturing process might be made after an accident for a number of reasons: simply to avoid another injury, as a sort of admission of error, because a better way has been discovered, or to implement an idea or plan conceived before the accident.
>
> *Grenada Steel*, 695 F.2d at 888.
>
> This Court also recently expressed similar sentiments in *Conner v. Quality Coach, Inc.*, 561 Pa. 397, 750 A.2d 823 (2000), in which we declined to extend common law principles that had been invalidated to support a substantive defense to a tort action. *See id.* at 415–17, 750 A.2d at 833–34. The present case is distinguishable, however, since the common law principles at issue remain viable, and we are concerned with determining the proper scope of a rule of evidence rather than a complete substantive defense.

18. *See generally Flaminio*, 733 F.2d at 469 (Posner, J.) (reasoning that "accidents are low probability events[;][t]he probability of another accident may be much smaller than the probability that the victim of the accident that has already occurred will sue the injurer and, if permitted, will make devastating use at trial of any measures that the injurer may have taken since the accident to reduce the dangers").

As the Superior Court has acknowledged, its decisions in this area conflict, *see Phatak v. United Chair Co.,* 756 A.2d 690, 692 n. 3 (Pa.Super.2000), and therefore, some specific discussion of its prior holdings is appropriate at this juncture. As noted, *Matsko* established a general rule that evidence of subsequent repairs was *admissible* in products liability cases, premised upon the *Ault* rationale. *See Matsko,* 325 Pa.Super. at 456, 473 A.2d at 156; *see also Leaphart v. Whiting Corp.,* 387 Pa.Super. 253, 268, 564 A.2d 165, 173 (1989) (stating that "[i]n Pennsylvania, the subsequent repair rule, forbidding admission of evidence of subsequent repair in a negligence action, is inapplicable in a strict liability case"), *appeal denied,* 525 Pa. 619, 577 A.2d 890 (1990). Since *Connelly* and *Gottfried* were decided after *Matsko,* those decisions deferred to *Matsko's* general rule of admissibility for subsequent repairs. However, rather than applying the "repair" rubric broadly as was the general practice at common law, *Connelly* and *Gottfried* limited *Matsko* to circumstances involving actual physical repairs in the definitional sense of the word. *See Connelly,* 404 Pa.Super. at 70–71, 590 A.2d at 13 (relying upon the fact that "the issue in *Matsko* was not design changes to the unit, but post-accident manufacturer recall of the unit which injured plaintiff"). *Connelly* and *Gottfried* were thus able to distinguish circumstances involving forward-looking design changes that did not affect products already in distribution, excluding such changes from *Matsko's* general rule of admissibility based upon the conclusion that such design improvements are irrelevant to the issues in a products liability case. *See Connelly,* 404 Pa.Super. at 70–71, 590 A.2d at 13; *Gottfried,* 339 Pa.Super. at 410, 489 A.2d at 226.[19] The present panel apparently disagreed with *Connelly's* general assessment of relevance and thus attempted to limit its holding, according to a passage from *Gottfried,* to the proposition that subsequent design changes cannot be admitted to establish the state of

19. In dissent in the present matter, Judge Del Sole applied similar reasoning. *See Duchess,* 709 A.2d at 416 (Del Sole, J., dissenting) (stating that "the true facts establish that there was no subsequent repair to the machine, but instead a subsequent change in product design").

the art at the time of distribution. *See Duchess,* 709 A.2d at 414.

Here, we depart from *Matsko,* as we have rejected *Ault's* reasoning in favor of a general rule of exclusion. Since *Connelly* and *Gottfried* proceeded from *Matsko,* their approach in attempting to create a "design change" exception to the *Matsko* rule is mooted—accordance of legal significance to the definitional distinction between an actual repair and a design change is unnecessary, as our reasoning applies to support the general exclusion of both forms of evidence as subsequent remedial measures under Rule 407. Moreover, *Connelly* and *Gottfried* relied upon a conclusion that design changes are irrelevant in a products liability case, whereas our holding embodies a different assessment of relevance and consideration of pertinent public policy. The present panel's insertion of a "state of the art" limitation into *Connelly* and *Gottfried* does not arise naturally out of those decisions, particularly in light of *Connelly's* statement that "design improvements made after the sale of the product are not relevant to the issue presented in a products liability case, which is whether the product was safe when sold," *Connelly,* 404 Pa.Super. at 71, 590 A.2d at 13, nor does our own reasoning support such a narrow interpretation of the general prohibition against the admission of evidence of subsequent remedial measures.

Finally, we acknowledge the Duchesses' arguments invoking the policy underlying strict liability, allowing recovery without proof of fault in part to alleviate the burden upon injured plaintiffs and to provide a mechanism to achieve loss spreading where appropriate. *See generally* RESTATEMENT (SECOND) § 402A, cmt. c. Such policies, however, have not been, and cannot be, applied to remove all forms of restriction imposed upon plaintiffs' proofs in products liability actions. Moreover, pertaining to Rule 407, plaintiffs will generally remain free to present expert testimony to support the theory that a design change was necessary to render the product safe, as occurred in the present case in the form of the Duchesses' evidence to the effect that the absence of an interlock rendered the Saturn

III defective. Based upon the character of the evidence and public policy, however, the general rule precludes plaintiffs from relying upon the defendant's subsequent implementation of such change to establish defectiveness. Significantly, Rule 407's general policy of exclusion is also appropriately tempered with exceptions to maintain fundamental fairness. *See generally Wood,* 70 F.3d at 1206 (stating that "allowance under Rule 407 of evidence of subsequent measures to prove ownership, control, feasibility or for impeachment provides an adequate balance to prevent defendants from taking unfair advantage of the exclusion"); *Werner,* 628 F.2d at 857 ("each of the listed exceptions deals with situations where the defendant might gain a direct benefit over and above the fact of exclusion").[20]

■ Accordingly, we hold that the general proscription against the admission of evidence of subsequent remedial measures embodied in Pennsylvania Rule of Evidence 407 and its common law antecedent extends to preclude use of a subsequent design change as substantive evidence of a product defect in a strict products liability case.

Having thus established, in the present case, that the general rule of exclusion was properly invoked in the first instance, we turn to the Duchesses' contention that the trial court erred in concluding that relevant exceptions were not implicated. As previously noted, the Duchesses argue that the testimony of Langston's expert brought into question the feasibility of an interlock device in the Saturn III's ink shield, thereby opening the door to the evidence that it had, in fact, incorporated such a device. Langston relies upon its general concession that an interlock device was technologically possible as removing any feasibility concern; in light of its concession, Langston maintains, essentially, that it was free to argue that an interlock was wholly impractical without implicating any exception to

**20.** Application of the rule of exclusion to claims alleging product defect also has the salutary effects of aligning the approach to the evidence in cases in which a plaintiff maintains both negligence and strict liability claims before a jury, and of eliminating the possibility of forum shopping based upon divergent state and federal approaches.

the subsequent remedial measures restraint upon the Duchesses.

■ As noted, Rule 407's general prohibition is expressly inoperable in relation to remedial measures evidence offered "for impeachment or to prove other controverted matters, such as ownership, control, or feasibility of precautionary measures." Pa.R.E. 407. Generally, courts have defined feasibility in this context more broadly than does Langston, to encompass not only technological possibility, but also considerations of cost and practicality and technological possibility.[21] Given the scope of such definition, however, courts have advised that it should be applied cautiously in the context of Rule 407's exceptions to prevent them from overwhelming the general rule, thus undermining its supporting policy goals. *See Cyr*, 652 A.2d at 694; *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1567 (11th Cir.1991); *McPadden v. Armstrong World Indus. Inc. (In re Joint E. Dist. and S. Dist. Asbestos Litig.)*, 995 F.2d 343, 345 (2d Cir.1993) (indicating that the feasibility exception is not an "open sesame").[22] Ac-

21. For example, one national treatise indicates as follows:

Feasibility denotes whether it would have been practicable to have employed the remedial measures earlier.... Whether something is feasible relates not only to actual possibility of operation, and its cost and convenience, but also to its ultimate utility and success in its intended performance; that is to say, "feasible" means not only possible, but also capable of being utilized, or dealt with successfully. 29 AM.JUR.2D EVIDENCE § 475 (1994); *see also Robbins v. Farmers Union Grain Terminal Ass'n*, 552 F.2d 788, 793 (8th Cir.1977) (defining feasibility in terms of "cost, practicality and technological possibility"); *Wetherill v. University of Chicago*, 565 F.Supp. 1553, 1557 (N.D.Ill. 1983) (stating that " '[f]easibility' of remedial measures, in the normal sense of the word, ... denotes whether it would have been practical to have employed them earlier"); *George v. Morgan Constr. Co.*, 389 F.Supp. 253, 264 (E.D.Pa.1975) (defining feasibility in terms of "whether there was a practical method which was neither too costly nor too burdensome to employ to prevent the accident"); *Kurz v. Dinklage Feed Yard, Inc.*, 205 Neb. 125, 286 N.W.2d 257, 260 (1979) (" 'feasibility' ... means more than capable of being done and includes effectiveness and practicality").

22. *See generally* 30 AM.JUR PROOF OF FACTS 3d 307 (1995) ("[d]espite the fact that Rule 407 explicitly permits the use of evidence of subsequent safety measures to impeach an adverse witness, courts remain sensitive to the policy reasons underlying the rule when considering whether to

cordingly, the feasibility exception has not been applied where a defendant merely suggests that an original design is acceptable, or argues about tradeoffs involved in taking precautionary measures. *See, e.g., Gauthier,* 788 F.2d at 638 (citing *Flaminio,* 733 F.2d at 468); *Grenada Steel,* 695 F.2d at 888; *Tuer v. McDonald,* 347 Md. 507, 701 A.2d 1101, 1113 (1997) (holding that remedial measures evidence was not admissible to impeach testimony that, at the time of the event, the measure was not believed to be as practical as the one employed) (citing *Hardy v. Chemetron Corp.,* 870 F.2d 1007 (5th Cir.1989)). Where, however, a defendant's evidence and arguments are framed in categorical terms, are presented in the form of superlatives, or, more generally, upset the balance of fairness that Rule 407 seeks to maintain, courts have found the exceptions applicable. *See, e.g., Wood,* 70 F.3d at 1208 (holding that, where the defendant's expert described the product design using superlatives, namely, the "safest [design] you could possibly put on the machine," the plaintiff should have been permitted to impeach the expert by inquiring why the safest design possible was modified following the plaintiff's accident); *cf. Muzyka v. Remington Arms Co.,* 774 F.2d 1309, 1313–14 (5th Cir.1985) (allowing admission of evidence of modifications to a rifle's safety mechanism for impeachment, where the manufacturer's representative repeatedly characterized the original mechanism as the safest possible). In such circumstances, trial courts should also balance the probative value of the remedial measure as implicated by the defense against its prejudicial impact, and consider whether some lesser measure would suffice to restore fairness. *See generally Harrison v. Sears, Roebuck & Co.,* 981 F.2d 25, 31–32 (1st Cir.1992) (citing 23 WRIGHT & GRAHAM, FEDERAL PRAC-

admit such evidence for impeachment purposes[;][i]n addition to concerns over jury confusion and undue prejudice, the inappropriate use of subsequent repair evidence to prove negligence is prohibited"); S. SALTZBURG & K. REDDEN, FEDERAL RULES OF EVIDENCE MANUAL 275 (4th ed.1986) ("lawyers who simply claim that the conduct of a defendant was not negligent and was reasonable under the circumstances do not open the door to subsequent repair evidence, whereas lawyers who claim that all reasonable care was being taken do open the door to such evidence").

TICE AND PROCEDURE § 5289, at 145 (1980)). Additionally, where a decision is made that the evidence should be admitted, an effective limiting instruction is appropriate.[23]

In the present case, while Langston conceded feasibility in its narrowest sense, its expert emphasized the need for an operator to visually inspect the anilox and wiper rolls while running, which would be precluded by the introduction of an interlock at the print shield location. For example, on direct examination, he testified as follows:

Q: Now, this particular shield or guard is not bolted on; why is the guard designed in such a way that you could actually open it, if you chose to, when the rolls are turning?

A: Well, it is designed that way to allow the people who are setting up the press to set the ink flow, the ink system, properly for the press run. There are two things that have to be done essentially each time you set up and change the ink. You have to set the quantity of ink that is delivered to the nip (Flipping drawing on easel.) The second one: The ink is coming out into that funnel, from that funnel, and it is going to get distributed across that nip has to be set by turning a valve. *You do that visually.* Basically, you want a stream of fluid to be coming through there, and you order a three-eighths to a half an inch in diameter, so

**23.** In his dissenting opinion, Mr. Justice Zappala finds the above principles confounding. It is difficult to fully address this position, since no alternative paradigm is specifically described. Presumably, the dissent would adopt Langston's approach that once a defendant concedes the technological possibility of a remedial measure, it gains the full benefit of Rule 407's exclusion regardless of the remaining character of the defense, including defense assertions that application of the remedial measure would not be at all practical or would preclude product operation. Certainly, such a bright-line rule would be simpler for trial courts to apply than the evaluative approach that has developed in the federal courts and other jurisdictions and is described above. However, we find that this approach better maintains the balance of fairness struck by Rule 407 and its common law antecedent and trust that our trial courts are capable of implementing the rule in the same manner as they routinely implement others requiring similar evaluations, *see, e.g.,* Pa.R.E. 403, in the ordinary exercise of their discretionary decision making in the evidentiary arena.

to get the proper quantity of ink into the nip itself. Then, you want to be able to observe the anilox roll turning to see how the ink is distributed across that.... *You need to observe that visually in motion; if it is stopped and you try to do it, you can't see it.* That is the two primary reasons. If you still have trouble with it, you may have to observe how the ink is being transferred from the anilox onto the printing dye. *But the first two is done, in my experience with flexographic machines, every time you do so.*

(emphasis added). The expert later elaborated on this point as follows:

The downsides are that *if you have an interlock in this particular application, you preclude the ability of the people setting up the machine to set the printing unit up properly.* There is also the inherent downsides associated with any form of an interlock device; the unit becomes a reliance mechanism to shut down the machine instead of shutting down through switches in this environment that they can accumulate ink inside and the internals will not operate. There are normal downsides associated with any control device. The primary design consideration is the ability to properly set up the printing section. That is why when you evaluate the design of this, that is the consideration that is overrunning.

(emphasis added).

Additionally, after Langston's counsel reiterated its position concerning the need for visual observation in his closing speech ("you occasionally have to lift [the print shield] to make sure the ink is flowing properly[;]" "... you have to get into the machine and work with these things"), he drew the following analogy:

Now, I ask, do you remember one question I asked Mr. Frank [the Duchesses' liability expert]? I said, "Mr. Frank, do you have any cars?" and he said he had two and I said, "Look, when you lift up the hoods of those cars with the engine running, do either of those cars have an interlock device?" and Mr. Frank said no. I said, "Well, look ...

inside that engine there is a fan right there." [A]nd I didn't go into it, but of course, there is the fan belt and other things that could be dangerous to people who would be entering into that part and I said to him, "That hood doesn't have an interlock. Are you saying that the two cars you have are both defective?" and you could see his mind working and you were there and you saw him on the stand and I can just imagine him thinking: "Look, if I answer [the] question yes, then every car in the world is defective; every car that these jurors own is defective, and the Judge's car is defective and the attorney's car is defective. They're not going to buy it." So, he said, "No." I asked him, "What's the difference between the cars and this flexo machine?" and he was stumped and he finally said, "Well, a car is a car and a printing machine is a printing machine."

Certainly, Langston's evidence was relevant and probative, and its arguments were well within the limits of appropriate trial advocacy. Our task, however, is not to evaluate the propriety of the defense presentation, but to determine the effect upon the evidentiary exclusion which Langston sought to maintain. In this regard, the argument that the Saturn III machine cannot be made to function properly with an interlock in place at the print shield location raises a substantial feasibility question under the general definition of the term. Langston's expert specifically framed his assertion to this effect in categorical terms ("you preclude the ability . . . to set the printing unit up properly"), which position was reinforced in other passages of his testimony. Such an assertion, if deemed credible, would gain substantially greater advantage than would more tempered explanations concerning the considerations underlying the original design balance struck by Langston in the time frame in which the decision was made. Langston further capitalized upon this advantage on cross-examination of the Duchesses' expert witness and in closing argument by reiterating the position that visual observation of the anilox and wiper rolls in operation is essential, and in the analogy between the Saturn III print shield and an automobile engine cover. Langston was able to suggest to the jury that

the opposing expert was stymied by the strength of this analogy, whereas, in fact, an effective rebuttal ("new car hoods remain the same, but new Saturn III's have print shield interlocks") was denied him by the exclusion of evidence of the subsequent design change. Indeed, Langston's ability to credibly tender the argument that proper printing is precluded by an interlock, or to pose the automobile analogy, would have been substantially compromised had the jury been advised that an interlock had been incorporated into the print shield in new machines.[24]

24. Both dissenting opinions find it unfair that a plaintiff would be permitted to offer evidence of the feasibility of an alternative safer design which must go unchallenged by the defendant in order to maintain the full benefit of the exclusion of remedial measures evidence. As framed by Mr. Justice Zappala:

> The majority in effect has allowed the plaintiff to set a trap which the defendant has no hope of avoiding; either the plaintiffs' assertions regarding feasibility must be left unchallenged, or they may be addressed, in which case it will be held that the defendant "raised a substantial feasibility question under the general definition of the term."

Dissenting Opinion (Zappala, J.), *op.* at 562. In the first instance, this position strikes at the evidentiary rule itself, which specifically provides that, "This rule *does not require the exclusion* of evidence of subsequent measures when offered ... to prove other *controverted matters*, such as ... feasibility of precautionary measures." Pa.R.E. 407 (emphasis added). It is pursuant to the express terms of the rule that a defendant simply cannot expect to controvert feasibility and maintain the full benefit of the evidentiary exclusion of a remedial measure that is relevant to such feasibility.

Further, we have not ignored the fact that the Duchesses offered evidence of the feasibility of interlocks on Saturn IIIs in their liability case, as the dissenting opinions assert. In this regard, neither dissenting opinion is able to offer any authority for the novel proposition that a plaintiff's tender of evidence to establish feasibility of an alternate design (other than remedial measures evidence) should open the door for the defendant to contest feasibility while maintaining the benefit of Rule 407. Significantly, such evidence is an essential element of the plaintiff's liability case predicated on a theory of design defect based upon the availability of an alternate, safer design. *See generally* 63A Am.Jur 2d Products Liability § 1095 (1997) (stating that "[t]he reasonableness of choosing from among various alternative product designs and adopting the safest one if it is feasible is not only relevant in a design defect action, but is at the very heart of the case"); Restatement (Third) of Torts, Products Liability § 2(b) & comment d (1998). A defendant's general stipulation of feasibility for purposes of maintaining the evidentiary exclusion does not automatically or necessarily foreclose the plaintiff from adducing its central evidence (or alter the plaintiff's

■ We recognize the difficulties in defending against a claim of an alternative, safer design, while at the same maintaining the advantage of the rule excluding evidence that an alternative design was later employed. Significantly, however, the rule does not require the surrender of a vigorous defense—presently, Langston was free to fully develop and advance the position that, in the time frame in which the Saturn III was delivered to Duchess's employer, its design was both acceptable and safe. To this end, Langston's presentation of evidence concerning the restricted access to the print shield location during normal operations, the ready availability and ease of application of safety precautions, and the training and experience of operators was both relevant and consistent with maintenance of the evidentiary exclusion. Langston also could have addressed the trade-offs associated with the design process on such terms, for example, by pointing out that an interlock would require substantial adjustments to the set-up process for printing that were not warranted given the safety of the existing design. Langston's evidence and arguments, however, went further, advancing the position that visual observation of the anilox/wiper rolls in operation was essential to the performance of the machine's function, and thus proper printing would be precluded by introduction of an interlock.

■ In such circumstances, we find that the exceptions in Rule 407 (and its common law counterpart) were implicated, both to permit the Duchesses to establish the feasibility of the alternate design and to impeach Langston's essential assertion that it could not practically be done. The trial court, then, should have determined whether the probative value of the evidence (in terms of feasibility and impeachment) exceeded its prejudicial impact, and whether some lesser restorative

position in relation to Rule 407 should it choose to adduce such evidence)—if this were the case, such stipulations would obviously be politely declined in favor of the development of an evidentiary record providing the jury with necessary context. Moreover, in this case it is abundantly clear that Langston's stipulation as to feasibility did not obviate the need for the development of feasibility evidence in the Duchesses' case in chief, particularly as this concession was clearly limited to the mere technological possibility of introducing an interlock.

measure would have sufficed. Here, however, the trial court did not perform such task or otherwise undertake an appropriate exercise of its discretion. Rather, it excluded the evidence of the design change to the Saturn III based upon the erroneous conclusion that Langston had never placed feasibility in issue or implicated impeachment concerns. Since we are unable to conclude that the advantage gained by Langston in these circumstances was insubstantial, we hold that the Superior Court's decision to award a new trial was correct.

Accordingly, the order of the Superior Court is affirmed, and the case is remanded for further proceedings consistent with this opinion.

Justice ZAPPALA files a dissenting opinion.

Justice NEWMAN files a dissenting opinion.

ZAPPALA, Justice, dissenting.

I agree with the majority that evidence of subsequent design change is generally inadmissible to show design defect in a product liability case. For two reasons, I disagree that the testimony of Langston Corporation's expert witness put in issue the question of feasibility, thereby invoking the exception to the general rule.

First, I believe it is inconsistent to give the term "feasibility" a broad definition and then suggest that it "be applied cautiously" to prevent it from overwhelming the general rule. Opinion at 554. I suspect that both attorneys and trial judges will be confounded in attempting to move in both directions at once, and application of the rule (and the exception) will provide fuel for contentious litigation in both the common pleas and appellate courts.

The citations to cases from other jurisdictions, given as examples of when the rule controls and when the exception, offer little guidance, especially in light of the result in the present case. To my mind, Langston's expert witness here "argue[d] about tradeoffs involved in taking precautionary measures," opinion at 555, yet this is the type of situation

where the majority suggests that the feasibility exception *does not* apply. In like fashion, one strains to discern how that same expert's testimony can be described as being "framed in categorical terms [or] presented in the form of superlatives," *id.*, which the majority proposes as the basis for applying the exception.[1]

Second, even assuming it has fashioned an appropriate definition of feasibility with the intention that it be applied cautiously, the majority, in examining the record to determine the result in this case, commits the fundamental error of taking excerpts from testimony out of context, in disregard of the import of the testimony as a whole. As ably demonstrated by Madame Justice Newman's Dissenting Opinion, which I join, it was the Duchesses who were responsible for raising the feasibility issue, not Langston. To the extent that Langston's expert witness addressed the feasibility issue, it was by way of response to the plaintiffs' evidence. Even then, according to a fair reading in context, it is plainly nothing more than "argument about tradeoffs involved in taking precautionary measures," as noted above.

The majority in effect has allowed the plaintiff to set a trap which the defendant has no hope of avoiding; either the plaintiffs' assertions regarding feasibility must be left unchallenged, or they may be addressed, in which case it will be held that the defendant "raised a substantial feasibility question under the general definition of the term." Opinion at 558.

Because the majority's exposition of the contours of the exception harbors the potential for much mischief, and because its application of the exception in this case is based on a reading of the record that unfairly characterizes the evidence, I respectfully dissent.

1. The majority also offers that the exception could come into play where "a defendant's evidence and arguments ... upset the balance of fairness that Rule 407 seeks to maintain." Opinion at 555. This amorphous language seemingly creates an option for the trial court to exercise its discretion in standardless fashion "in the interest of fairness", which if exercised would undoubtedly be a case of the exception swallowing the rule.

NEWMAN, Justice, dissenting.

I agree with the conclusion of the Majority that evidence of a subsequent design change is irrelevant in a strict products liability action to show product defect. However, I dissent because I do not believe that Langston "opened the door" to the admissibility of evidence of the subsequent design change. Accordingly, the trial court did not commit an abuse of discretion in excluding the evidence as irrelevant. Thus, I would reverse the decision of the Superior Court on this issue.

The testimony that the Majority cites to support its conclusion must be taken in the context of the trial, which shows that it was Duchess, and not Langston, that constantly injected feasibility of an alternative design into the trial, even though Langston had conceded that the interlock device was technologically possible. For instance, counsel for Duchess read to the jury answers to interrogatories indicating that, at the time Langston manufactured the Saturn III, Langston possessed the interlock technology. (R. 342a). Further, Langston admitted that the interlock "existed on other substantially similar machines manufactured by Langston." *Id.* Then, Duchess presented testimony from expert John Frank, who testified in response to a question as to whether the interlock at issue was feasible:

it is completely feasible and there is absolutely no reason for it not to have been incorporated in its design ...

(R. 359a) (emphasis added).

Further, when asked *by counsel for Duchess,* and not by Langston, whether the incorporation of an interlock was *practical,* Mr. Frank responded that it was:

Simply because it could be done; interlocks are incorporated in the design of many, many machines, in many different applications. There are millions of interlocks in existence for this reason ...

*Id.* He also commented, on cross examination that:

The concept of interlocks and the need of interlocks is well recognized by Langston. Many interlocks are incorporated

into this machine. Unfortunately, they just left this one out.

(R. 412). Further, on cross-examination as to the downsides of an interlock, Mr. Frank responded:

The experience is that there is no such problem as that in the use of interlocks like that in this application, It is completely feasible. *There is no reason in the world why it can't be done.*

(R. 416a).

In this context, Langston presented the testimony of its expert, Peter Schwalje, an engineer, who again agreed that an interlock could have been placed on the machine. (R. 565a). He, however, opined that the interlock was not necessary because "the motion hazards which were there were adequately recognized or adequately provided for by the safeguards." (R. 565a). He then testified to the "downsides" of the interlock as follows:

The downsides are that if you have an interlock in this particular application, you preclude the ability of the people setting up the machine to set the printing unit up properly. There is also the inherent downsides associated with any form of an interlock device; the unit becomes a reliance mechanism to shut down the machine instead of shutting down through switches in this environment that they can accumulate ink inside and the internals will not operate. There are normal downsides associated with any control device. The primary design consideration is the ability to properly set up the printing section. That is why when you evaluate the design of this, that is the consideration that is overrunning.

(R. 570a). It is this testimony that the Majority opines "opened the door" to the introduction of evidence of subsequent design changes to the Saturn III. I disagree because I do not believe that this testimony contests the mechanical or technological feasibility of the interlock device and the trial court did not commit an abuse of discretion in excluding evidence of the subsequent design changes as irrelevant to the

issue at trial. *Abbott, supra,* 263 A.2d at 884. Instead, the testimony of Langston's expert was in fair response to the repeated statements of the expert for Duchess that there was no reason for the interlock to be absent from the design of the Saturn III. Accordingly, the trial court did not abuse its discretion in refusing to allow evidence of subsequent remedial measures into the trial, and I would reverse the Superior Court on this issue.