J-A14023-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JESSE HERNANDEZ | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| INDEPENDENCE CONSTRUCTION | : | |
| CORPORATION, SOUTHEASTERN | : | |
| PENNSYLVANIA TRANSPORTATION | : | No. 1911 EDA 2023 |
| AUTHORITY, NATIONAL RAILROAD | : | |
| PASSENGER CORPORATION D/B/A | : | |
| AMTRAK | : | |

Appeal from the Judgment Entered July 14, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 181202689

BEFORE: LAZARUS, P.J., STABILE, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED AUGUST 18, 2025**

Independence Construction Corporation ("ICC") appeals from the judgment imposed, following a jury trial, in favor of Jesse Hernandez ("Hernandez") in this catastrophic workplace injury matter. After careful review, we affirm.

## I. Facts & Procedural History

The trial court summarized the underlying facts as follows:

> On March 12, 2018, Plaintiff . . . Hernandez was hit by a South Eastern Pennsylvania Transportation Authority ("SEPTA") train while in the scope of his employment with Minority Services, Inc. ("MSI"), a subcontractor of [Defendant ICC], and survived. [Steven Hare ("Hare") owned both ICC and MSI.]
>
> ICC had long standing contracts with SEPTA to perform janitorial services and maintenance work. Since 2012, ICC contracted with SEPTA to perform construction projects that involved trenching to lay conduit pipe for electrical lines[. ICC]

> subcontracted all contracts that involved trenching to MSI. The controlling contract between ICC and SEPTA and subsequently between ICC and MSI when [Hernandez] was injured involved trenching for the purpose of installing underground conduit pipe for electrical lines along [a SEPTA] train line[. Hernandez] worked for MSI for about two years prior to the accident.

Trial Court Opinion, 12/19/23, at 1 (footnote omitted and paragraph break added).

It is undisputed in this case that "trenching" was a process of digging long and narrow ditches in the soil below the surface of the ground. For present purposes, trenching also encompassed the refilling of the ditches with soil after laying electrical conduit piping in them. The contract between SEPTA and ICC required the ditches to be dug by hand.

Furthermore, the contract with SEPTA required ICC to implement certain safety measures, such as the posting of qualified watchpersons and protective barriers parallel to the ditches. ICC engaged MSI to perform these "watchperson duties." Trial Exhibit P-1, Contract for Technical Services, 3/8/18, at 11 (unnecessary capitalization omitted). Watchpersons were to be stationed around the jobsite and were to timely alert workers of any oncoming SEPTA trains. At the time, SEPTA trains were not required to come to a complete stop as they approached the digging and conduit laying operations. The trenching and watchperson services provided by ICC were exclusively carried out by MSI and its employees, although some were previously employed by ICC.

As stated above, Hernandez was working as an MSI employee, performing trenching work within approximately four feet of SEPTA's train tracks, when he was struck by a train. Hernandez survived, but "suffered significant injuries [and] was put into a medically induced coma[. He] suffered a traumatic brain injury, hearing loss, injuries to the ligaments in his cervical spine, and additional fractures to his sternum, nose, cheeks, and skull." Trial Court Opinion, 12/19/23, at 2.

Hernandez filed the instant suit against, *inter alia*, SEPTA and ICC, asserting claims of negligence.[1] He alleged: SEPTA's trains were not safely operated near the work site; the contractually required safety measures meant to protect him were inadequate; and he was unreasonably placed in danger by those conditions.

This matter proceeded to a jury trial. We surmise from the record that SEPTA settled with Hernandez, but remained as a party and was included on the jury's verdict slip for allocation of fault.

At trial, Hernandez argued that SEPTA and ICC were liable for his injuries, because: they were responsible for directing the movement of trains along the lines where he worked; and they controlled the work site. According to Hernandez, it was the duty of both SEPTA and ICC to ensure that his workplace was safe.

---

[1] Hernandez also had named National Railroad Passenger Corporation d/b/a AMTRAK as a defendant, but that party was dismissed prior to trial.

Pertinently, the trial court made several evidentiary rulings, concerning the extent to which witnesses could comment, or be subject to questioning, about ICC's compliance with provisions in its contract with SEPTA. Additionally, ICC sought to preclude evidence of remedial measures implemented by SEPTA after Hernandez's accident, namely, "Rule 135," which required trains to come to a full stop before work areas near railings and trenches. **See** N.T. Trial, 2/7/23 A.M., at 44-48. We discuss these issues as they arise **infra**.

At the close of Hernandez's case, ICC moved for compulsory nonsuit and/or a directed verdict, asserting that it was the statutory employer of Hernandez under the Pennsylvania Workers' Compensation Act[2] ("WCA"), and thus was immune from tort liability. The trial court denied relief.

Ultimately, the jury found ICC, SEPTA, and Hernandez were all negligent, and all of their negligence was a factual cause of harm to Hernandez. The jury apportioned liability as follows: (1) ICC — seventy percent liable; (2) SEPTA — twenty-nine percent liable; and (3) Hernandez — one percent liable. The jury awarded Hernandez judgment in the amount of $7,297,700.86.

ICC filed a post-trial motion, seeking judgment notwithstanding the verdict ("JNOV"), again asserting immunity under the WCA. ICC also requested, alternatively, a new trial on the grounds the trial court erred in

---

[2] **See** 77 P.S. §§ 1-2710.

- 4 -

admitting certain evidence. The trial court denied ICC's post-trial motion. ICC

filed a timely notice of appeal, and both it and the trial court have complied

with Pa.R.A.P. 1925.

ICC presents twelve issues for our review:

1. Whether the trial court erred in holding that ICC was not a statutory employer under section 302(a)(1)(i) of the [WCA] when it concluded that ICC was not an employer that contracted with another to have work[]performed consisting of excavation based on its conclusion that the meaning of "excavation" under the WCA is restricted to the extraction of minerals and not trenching operations at a construction site[.]

2. Whether the trial court erred in denying ICC's motion for [JNOV] in holding that the evidence of record did not establish that ICC contracted for the performance of excavation work and, therefore, concluded that ICC was not a statutory employer immune from suit under section 302(a)(1)(i) of the WCA[.]

3. Whether the trial court erred in holding that ICC was not a statutory employer under section 302(a)(2) of the WCA where it conflated the requirements of section 302(a)(2) with those of section 302(a)(1)(i) by finding that section 302(a)(2) applies only to contracts for the excavation of natural minerals or similar activities[.]

4. Whether the trial court erred in holding that ICC was not a statutory employer under section 302(a)(2) of the WCA where, in fact, ICC had subcontracted to [Hernandez's] employer to perform trenching operations which was a regular and recurrent part of ICC's business[.]

5. Whether the trial court erred in holding that ICC was not a statutory employer under section 302(b) of the WCA where the evidence at trial established control of the worksite and all of the **McDonald**[3] factors[.]

---

[3] **See McDonald v. Levinson Steel Co.**, 153 A. 424 (Pa. 1930).

- 5 -

6. Whether the trial court abused its discretion in admitting evidence of ICC['s] purported non-compliance with SEPTA contractual requirements governing Disadvantaged Business Enterprises [("DBE")] and Contractor Integrity policies that were not probative of any fact relevant to the negligence claim, were highly inflammatory and prejudicial to ICC[,] and by denying ICC's motion for a new trial[.]

7. Whether the trial court abused its discretion and erred in the application of law by admitting evidence of ICC['s] purported noncompliance with SEPTA contractual requirements governing [DBE] and Contractor Integrity policies as character evidence under Pa.R.[E.] 608(a) where such evidence was not admissible character evidence under Pa.R.E. 608(a) or (b) and by denying ICC's motion for a new trial[.]

8. Whether the trial court abused its discretion and erred in the application of law by mischaracterizing evidence of ICC['s] purported non-compliance with SEPTA contractual requirements governing [DBE] and Contractor Integrity policies as impeachment evidence as to credibility and by failing to engage in a balancing test of the prejudicial impact to ICC as required by Pa.R.E. 403 and by denying ICC's motion for a new trial[.]

9. Whether the trial court abused its discretion in admitting non-probative evidence of ICC's alleged breach of contract through testimony of [Hernandez's] engineering expert and by denying ICC's motion for a new trial[.]

10. Whether the trial court abused its discretion in admitting nonprobative evidence of subsequent remedial measures, where the prejudice to ICC exceeded its probative value, and by denying ICC's motion for new trial[.]

11. Whether the trial court erred in declining to charge the jury that subsequent remedial action was not relevant to the claims against ICC and by denying ICC's motion for new trial[.]

12. Whether the trial court erred in denying ICC's motion for new trial or [JNOV] where there was an insufficiency of evidence to sustain the verdict[.]

ICC's Brief at 2-4 (unnecessary capitalization and suggested answers omitted).

## II. WCA Statutory Employer Claims

In ICC's first five claims, it avers the trial court erred in finding it was not a "statutory employer" under sections 302(a) and (b) of the WCA. We reiterate that ICC asserted it was a statutory employer in motions for a directed verdict and JNOV.[4] We consider the applicable standards of review:

> [W]e must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a [JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.
>
> There are two bases upon which a [JNOV] can be entered[:] one, the movant is entitled to judgment as a matter of law[;] and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the

---

[4] We note that on appeal, Hernandez argues ICC has waived its immunity claims because it did not raise them until the close of his case. However, immunity under the WCA implicates the subject matter jurisdiction of this Court, and thus is not waivable and may be "raised at any stage in the proceedings by the parties or by a court [o]n its own motion." ***In re Petition for Enf't of Subpoenas issued by Hearing Exam'r in a Proceeding before Bd. of Med.***, 214 A.3d 660, 663 n.3 (Pa. 2019) (citation omitted); ***see also LeFlar v. Gulf Creek Indus. Park No. 2***, 515 A.2d 875, 879 (Pa. 1986) (holding the WCA "deprives the common pleas courts of jurisdiction of common law actions in tort for negligence against employers and is not an affirmative defense which may be waived if not timely plead[ed]").

movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

Determinations of credibility [and conflicts in evidence] are for the fact finder.

*Janis v. AMP, Inc.*, 856 A.2d 140, 143-44 (Pa. Super. 2004) (citations omitted).[5]

With respect to the WCA, this Court has explained:

By way of background, under the WCA, employers must pay workers' compensation benefits, regardless of negligence, to employees who sustain injuries in the course of their employment. *See* 77 P.S. § 431. In exchange for receiving these benefits without having to prove negligence, employees may not sue their employers in tort for injuries they incurred in the course of their employment. *See* 77 P.S. § 481(a). In other words, with respect to work-related injuries, the employers have immunity from tort liability.

. . . [P]ursuant to Section 302(a) of the WCA, codified at 77 P.S. § 461, certain contractors who meet a specialized definition take on secondary liability for the payment of workers' compensation benefits to the injured employees of their subcontractors. *See* 77 P.S. § 461; *see also Six L's Packing Co. v. W.C.A.B. (Williamson)*, . . . 44 A.3d 1148, 1157 (Pa. 2012). Thus, in the event the subcontractor-employers cannot or will not pay workers' compensation benefits to their subcontractor-employees, these contractors assume workers' compensation liability. 77 P.S. § 461. As such, despite not being the actual employers of the subcontractor-employees, these contractors are considered "statutory employers" of the

---

[5] ICC also challenges the trial court's denial of its motion for a compulsory nonsuit. However, this Court has explained that once a defense is presented at trial, a trial court's refusal to grant a nonsuit becomes moot. *See Whitaker v. Frankford Hosp.*, 984 A.2d 512, 517 (Pa. Super. 2009). We therefore limit our review of ICC's first five issues to the trial court's denial of a directed verdict and JNOV.

subcontractor-employees due to their treatment under the WCA. Like the treatment of actual employers under the WCA, in return for assuming secondary liability for the payment of workers' compensation benefits, statutory employers enjoy immunity in tort for injuries the subcontractor-employees receive during the course of their employment. **See** 77 P.S. § 481(a); **Doman v. Atlas America, Inc.**, . . . 150 A.3d 103 (Pa. Super. 2016). The contractors enjoy this immunity "by virtue of statutory-employer status alone, such that it is accorded even where the statutory employer has not been required to make any actual benefit payment."

**Dobransky v. EQT Production Co.**, 273 A.3d 1133, 1134-35 (Pa. Super. 2022) (*en banc*) (some citations omitted).

Here, ICC claims status as a statutory employer, and hence immunity from tort liability, under subsections 302(a) and (b) of the WCA, which appears at 77 P.S. §§ 461 and 462, respectfully. We address each subsection in turn.

### A. Section 302(a)

Section 302(a) of the WCA deems a contractor the employer of a subcontractor's employee, and thus entitled to immunity from tort liability, under the following circumstances:

A contractor who subcontracts all or any part of a contract and his insurer shall be liable for the payment of compensation to the employes of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured its payment as provided for in this act. Any contractor or his insurer who shall become liable hereunder for such compensation may recover the amount thereof paid and any necessary expenses from the subcontractor primarily liable therefor.

For purposes of this subsection, a person who contracts with another (1) to have work performed consisting of (i) the removal, excavation or drilling of soil, rock or minerals, or (ii) the cutting

- 9 -

> or removal of timber from lands, or (2) to have work performed of a kind which is a regular or recurrent part of the business, occupation, profession or trade of such person shall be deemed a contractor, and such other person a subcontractor. This subsection shall not apply, however, to an owner or lessee of land principally used for agriculture who is not a covered employer under this act and who contracts for the removal of timber from such land.

77 P.S. § 461.

The above two paragraphs separately define when a "contractor" or a "person" may have liability to pay compensation benefits as a statutory employer. The first paragraph provides that a ***contractor***, who "subcontracts" all or part of a contract, is secondarily liable to pay compensation to a subcontractor's employee if the subcontractor does not carry worker's compensation insurance. ***See*** 77 P.S. § 461. The contractor may then seek relief against the subcontractor who was primarily liable to pay benefits. ***See id***.

The second paragraph provides that a ***person*** is liable as a "contractor" if he contracts "to have [one of the following types] of work performed:" (1) "the removal, excavation or drilling of soil, rock or minerals;" (2) "the cutting or removal of timber from lands;" or (3) "work [that] is of a kind which is a regular or recurrent part of the business, occupation, profession or trade of such person shall be deemed a contractor, and such other person a subcontractor." 77 P.S. § 461. Under these three circumstances, the person is deemed a "contractor" and the other a "subcontractor." ***Id***.

- 10 -

Long ago, our Supreme Court recognized in **McDonald** that the statutory immunity provisions in section 302 of the WCA present an "oft-recurring difficulty," in which the exceptions enumerated in the statute may be exploited to the detriment, rather than the benefit, of injured workers:

> On the one hand, we have persons before us . . . endeavoring to escape the effect of the [WCA] so that they will not be compelled to pay compensation or carry insurance, and, on the other hand, . . . when faced with liability at common law, they strive vigorously to come under the sheltering protection of the [WCA]. . . .

**McDonald**, 153 A. at 425. For that reason, courts have been wary of granting statutory employer immunity, with some going so far as to question whether the statutory employer doctrine still "serves the remedial purpose of the" WCA. **Doman**, 150 A.3d at 109-10 (noting that section 302 may give general contractors a "windfall" of immunity from an employee's tort claims because, since 1974, all subcontractors have been bound by law to provide workers' compensation benefits to their employees).

In ICC's first two immunity claims, it contends that it qualifies as a statutory employer under section 302(a) because the work performed by Hernandez was "excavation."

Both ICC and Hernandez focus their arguments on the meaning of the term "excavation," which the WCA does not define. **See** 77 P.S. §§ 21-29 ("Definitions"). According to ICC, "excavation" refers broadly to any digging out, or removal, of soil or rocks in the ground. Hernandez counters that ICC's interpretation would extend immunity to any general contractor, as nearly all

construction projects involve some degree of soil displacement. Instead, Hernandez argues "excavation" must be the "principal purpose" of a contract in order for the "excavation" provision of section 302 to apply. Hernandez's Brief at 10. Under his reading, ICC cannot qualify as a statutory employer because "the dirt and soil was only temporarily dug up in order to lay the conduit and [then] put back [into] the trench." *Id*. at 13. To resolve this issue of statutory interpretation, we must determine how the legislature intended the term "excavation," as it appears in section 302(a), to be construed.

In issues involving statutory construction, "this Court's standard of review is plenary and non-deferential." ***Martin v. DOT, Bureau of Driver Licensing***, 905 A.2d 438, 443 (Pa. 2006). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S.A. § 1921(a). A "statute's plain language generally offers the best indication of legislative intent." ***Martin***, 905 A.2d at 443. We note:

> . . . ***General rule. —*** Words and phrases shall be construed according to rules of grammar and according to their common and approved usage[. B]ut technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition.

1 Pa.C.S.A. § 1903(a). Additionally, we consider:

> **(a) *Object and scope of construction of statutes. —*** The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.

- 12 -

Every statute shall be construed, if possible, to give effect to all its provisions.

**(b) *Unambiguous words control construction.* —** When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

**(c) *Matters considered in ascertaining intent.* —** When the words of a statute are not explicit, the intention of the General Assembly may be ascertained by considering [certain factors.]

1 Pa.C.S.A. § 1921(a)-(c). "A statute is ambiguous when there are at least two reasonable interpretations of the text." ***A.S. v. Pa. State Police***, 143 A.3d 896, 905-06 (Pa. 2016).

Here, the competing interpretations, offered by ICC and Hernandez, as to the term "excavation" are both reasonable on their face, demonstrating that there is an ambiguity in section 302(a). ***See id***. The plain language of section 302(a) offers no further guidance. Nonetheless, ICC has cited no case, and we have found none, where a contractor was granted tort immunity under section 302(a) because an injured employee of a subcontractor had moved soil, rock, or minerals in the manner that Hernandez did at MSI's direction. Likewise, Hernandez has not pointed to any authority that supports a definition of "excavation" under section 302(a) to encompass more than the incidental displacement of soil, rock, or minerals.

Our examination of the WCA and, specifically, section 302(a) suggests that "excavation" should be construed narrowly and in its technical sense, as that term is used in the construction industry. In general, the WCA refers to

"work" broadly. Section 302(a), however, specifies specialized types of work in identifying who is a "statutory employer" under the WCA. "Section 302(a) sets forth a specialized definition of contractor, which . . . includes 'a person who contracts with another to have work performed consisting of the removal, excavation or drilling of [soil, rock or] minerals[.]" ***Doman***, 150 A.3d at 107 (*quoting* 77 P.S. § 461); ***see also Six L's Packing Co.***, 44 A.3d at 1159 n.12 (stating that because the WCA "employ[s] differing conceptions of 'contractor' and 'subcontractor,' [s]ection 302(a) is best interpreted . . . according to its own terms").

We may infer from this that the WCA's reference to "the removal, excavation or drilling of soil, rock or minerals," means particular or specialized types of work, and that the legislature intended to employ these words in a technical sense. ***See e.g., Kilmer v. Elexco Land Services, Inc.***, 990 A.2d 1147, 1157 (Pa. 2010) (rejecting the common definition of the word "royalty," in interpreting that term in the Guaranteed Minimum Royalty Act, and instead applying, consistent with our rules of statutory interpretation, "the definition it has acquired in the oil and gas industry"); ***Sackett v. Nationwide Mutual Ins. Co.***, 940 A.2d 329, 333 (Pa. 2007) (holding that the term "purchase" of uninsured and underinsured motorist insurance coverage under 75 Pa.C.S.A. § 1738(c), of the Motor Vehicle Financial Responsibility Law, "was a term of art in the automobile insurance arena"); ***see also Sternlicht v. Sternlicht***, 876 A.2d 904, 913 (Pa. 2005) (Cappy, J., concurring) (stating the term "gift,"

under the Pennsylvania Uniform Transfers to Minors Act, is a technical word that has acquired a peculiar and distinct meaning)

In the construction industry,[6] there is a marked difference between "excavation" and "digging."[7] While both activities involve the removal of soil, rock, or other materials, they fundamentally differ in scope, method, and purpose. "Digging" generally means the breaking and removing of earth with handheld tools, such as shovels, spades, or trowels. Digging can be a part of routine maintenance tasks, such as trenching for pipes or preparing a foundation for a small structure.

"Excavation" occurs on a more extensive, industrial scale. It often involves a mechanized process, employing heavy machinery such as excavators, bulldozers, and backhoes to remove significant volumes of material from the ground. Excavation is typically performed to prepare a site for construction, resulting in significant changes to the existing contour or height of land.

---

[6] Neither ICC nor Hernandez moor their competing definitions of "excavation" to how the term is used in the construction industry. As discussed above, however, our standard of review is plenary, and we reason that "excavation" is a technical term of art, the distinct meaning of which must guide this Court in construing the scope of section 302(a) of the WCA. *Martin*, 905 A.2d at 443.

[7] *See e.g.*, https://www.freedomconstructionanddesign.com/difference-between-digging-and-excavation/; https://shillingexcavation.com/difference-between-digging-and-excavation/; https://indepthex.com/is-excavation-and-a-dig-the-same-thing/ (last visited June 9, 2025).

Applying this distinction to the work ICC subcontracted to MSI, we conclude that at the time of his injury, Hernandez's job was "digging," and not "excavation." At MSI's direction, Hernandez performed "trenching" services, which entailed the digging of long and narrow ditches in the soil below the surface of the ground so that electrical conduit piping could be laid in them. Hernandez refilled the ditches with soil after the piping process was complete. The contract between SEPTA and ICC required the ditches to be dug by hand, without mechanized or motor-powered excavation equipment. In industry parlance, then, Hernandez's work would not be considered "excavation." Because ICC did not subcontract MSI to perform work fitting the definition of the term "excavation," ICC was not, as it contends, entitled to statutory employer immunity under section 302(a) of the WCA.

We note this interpretation of "excavation" is consistent with the overall purpose of the WCA. *See* 1 Pa.C.S.A. § 1921(a). Our Supreme Court has emphasized the WCA "is remedial in nature and its purpose is to benefit the workers of this Commonwealth. Thus, the [WCA] is to be liberally construed to effectuate its humanitarian objectives, and borderline interpretations are to be construed in the injured party's favor." *Tooey v. AK Steel Corp.*, 81 A.3d 851, 858 (Pa. 2013).

Additionally, our interpretation comports with the handful of prior decisions in which a worker's injury, incurred during the industrial-level extraction of natural resources, implicated section 302(a). These cases are

- 16 -

consistent with our understanding of section 302(a) as concerning "the removal, excavation or drilling of soil, rock or minerals" in the technical, or specialized sense, and not the general sense advanced by ICC. *See Dobransky*, 273 A.3d at 1140. That is, this subsection of the WCA has only *ever* been invoked in the context of a large-scale mechanized process, and "excavation" did *not* refer to the digging of narrow trenches by hand, as Hernandez did here. *See, e.g., id*. at 1139-44 (analyzing the application of section 302(a)(1)(i) to an accident that occurred at a natural gas well site); *Doman*, 150 A.3d at 104 (analyzing the application of section 302(a)(1)(i) to an accident that occurred at an oil and gas drilling site); *see also Coleman v. Chief Oil & Gas, LLC*, 2022 WL 821167, at *3 (M.D.Pa. 2022) (applying section 302(a)(1) to an accident that occurred during natural gas well drilling operations); *Delich v. W.C.A.B. (Lyons)*, 661 A.2d 936, 936-37 (Pa. Cmwlth. 1995) (analyzing section 302(a)(1) in the context of an accident that occurred during timber harvesting operations).[8]

In sum, we conclude ICC was not a statutory employer under section 302(a). ICC subcontracted with MSI to dig trenches in a method that does not fit the definition of "excavation," as the term is understood in the construction industry. Thus, as a matter of law, the trial court did not err in

---

[8] While this Court is not bound by decisions of the Commonwealth Court or federal district courts, they provide persuasive authority, and we review them for guidance when appropriate. *See Ruff v. York Hosp*., 257 A.3d 43, 60 n.7 (Pa. Super. 2021); *see also 9795 Perry Highway Mgmt., LLC v. Bernard*, 273 A.3d 1098, 1106 n.6 (Pa. Super. 2022).

narrowly construing section 302(a) and ruling it is inapplicable to ICC.  ***See***

***Dobransky***, 273 A.3d at 1149 ("declin[ing] to expand the scope of the oft-criticized section 302(a)(2) to delivery persons [who transport materials] by interpreting it in such a broad manner").

ICC's third and fourth immunity claims may be combined into a single issue — whether the trial court erred in finding, as a matter of law, that it did not qualify for immunity under the third category of contracted work identified under section 302(a) of the WCA: "work performed of a kind which is a regular or recurrent part of the business, occupation, profession or trade of such person[.]"  77 P.S. § 461.

At trial, it was undisputed that MSI was contracted by ICC to provide trenching and watchperson services.  It was MSI, not ICC, which performed the trenching and related safety measures for workers engaged in the refitting of electrical conduit lines running alongside SEPTA's train tracks and rights of way.  There was no evidence that such work was a regular or recurrent part of ***ICC's*** business, occupation, profession or trade.

Hare, the owner of ICC, testified at trial to all of the following.  ICC: has existed for forty-two years; has performed jobs for SEPTA for about thirty years; and first began contracting to provide trenching and watchperson services work on SEPTA projects in 2012.  Prior to that point, ICC had only contracted to provide SEPTA with services consisting of "tree work, landscaping, janitorial work[,] and snow removal."  N.T. Trial, 2/14/23 P.M.,

at 105. When ICC first agreed to provide trenching and watchperson services to SEPTA in 2012, ICC had the role of "general contractor," with the duty to "supply the crew number that was requested, [and the] number of people that were requested to do the trenching[.]" *Id.* at 111. This work was *always* subcontracted to MSI, and the workers for trenching services were considered MSI employees. *See* N.T. Trial, 2/6/23 P.M., at 33-34 ("The contract for SEPTA is with [MSI], that we work for [MSI] when we trench."). ICC presented no evidence that an ICC employee had ever provided such services to SEPTA or to any other party.

The record instead supports the trial court's finding that "ICC was in [the] business [of] providing janitorial and landscaping services to SEPTA and for the company's history was in the janitorial and landscaping service." Trial Court Opinion, 12/19/23, at 19. With respect to trenching and watchperson services, the record established that ICC operated as a project manager which always subcontracted such work to MSI; ICC never performed those services itself. *See id*. Because the performance of trenching and watchperson services were only a regular and recurrent part of *MSI's* business, occupation, profession, or trade, ICC could not show it was entitled it to tort immunity under section 302(a)(2) of the WCA. We thus conclude the trial court did not err in finding this subsection was inapplicable to ICC.[9]

_____

[9] On appeal, Hernandez argues that the WCA's statutory employer defense is unconstitutional. *See* Hernandez's Brief at 53. Having concluded that ICC

**B. Section 302(b)**

ICC's fifth and final immunity claim is that the trial court erred in ruling

it failed to qualify as a statutory employer under section 302(b) of the WCA,

which appears at 77 P.S. § 462.[10]  This subsection is the more commonly

invoked test for a statutory employer, and it applies when a contractor can

establish all five of the following elements:

> (1) An employer who is under contract with an owner or one in the position of an owner.  (2) Premises occupied by or under the control of such employer.  (3) A subcontract made by such employer.  (4) Part of the employer's regular business entrusted to such subcontractor.  (5) An employee of such subcontractor.

---

was not entitled to immunity under those provisions, we do not reach this claim.

[10] Section 302(b) of the WCA provides:

> Any employer who permits the entry upon premises occupied by him or under his control of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of such employer's regular business entrusted to that employe or contractor, shall be liable for the payment of compensation to such laborer or assistant unless such hiring employe or contractor, if primarily liable for the payment of such compensation, has secured the payment thereof as provided for in this act. Any employer or his insurer who shall become liable hereunder for such compensation may recover the amount thereof paid and any necessary expenses from another person if the latter is primarily liable therefor. For purposes of this subsection (b), the term "contractor" shall have the meaning ascribed in section 105 of this act.

77 P.S. § 462.

*McDonald*, 153 A. at 426. "[C]ourts should construe the elements of the *McDonald* test strictly and find statutory employer status only when the facts clearly warrant it." *Peck*, 814 A.2d at 189.

Finally, we reiterate that a directed verdict and JNOV are only proper where "the movant is entitled to judgment as a matter of law [and/or] the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Janis*, 856 A.2d at 143.

ICC argues the record evidence established the *McDonald* factors above. It maintains:

> ICC served as the general contractor[;] it was on site regularly, supplied the watchman, controlled the assignment of workers to the projects, supplied the tools and equipment for the performance of the work, coordinated with the project owner, SEPTA[,] and was charged with the authority for the manner in which the work was to be done and safety on the job site[.]
>
> The trial court relied on evidence that a SEPTA employee determined the location and dimensions of the trench; yet control need not be exclusive and ample evidence existed as to ICC's control and responsibility for the project apart from the physical location and dimensions of the trench.

ICC's Brief at 35-36 (paragraph break added).

The trial court cited ample record evidence to deny JNOV, much of it presented by ICC, showing that SEPTA exercised actual control over the worksite on which Hernandez was injured, and that ICC did not continuously occupy the premises. The court thus concluded the second *McDonald* element — that the premises were "occupied by or under the control of" the

- 21 -

employer — was not met. **See McDonald**, 153 A. at 426. Indeed, ICC's position at trial was that it could not be liable because SEPTA: was ultimately responsible for training MSI's employees on how their work was to be done; provided daily briefings to MSI's employees at the job site regarding work and safety operations; determined trench depth and distance from SEPTA's lines; and enforced SEPTA's safety rules.

The trial court further considered that it was "indisputable that ICC did not have a trailer on site." Trial Court Opinion, 12/19/23, at 11. Hare himself testified: he was not at the worksite every day; on the days when he did appear, it was for a limited period; and he was absent on the day that Hernandez was injured. **See id**. Additionally, "it was not established that ICC had only employees on site whenever . . . Hare was not present." **Id**.

Strictly construing this element of the **McDonald** test, we conclude ICC did not indisputably establish it was entitled to judgment pursuant to section 302(b) of the WCA. Even assuming that ICC could, or did, present some evidence that it sufficiently controlled the worksite, there remained a dispute of fact as to the extent to which it occupied or exercised actual control over the premises on which Hernandez was injured. Viewing the facts in the light most favorable to Hernandez as the verdict winner, the trial court did not abuse its discretion or commit an error of law in denying ICC's motion for JNOV or directed verdict. **See Janis**, 856 A.2d at 143-44; **see also** Trial Court Opinion, 12/19/23, at 8-13.

For the foregoing reasons, we conclude no relief is due on ICC's first five claims, all invoking statutory employer status under the WCA.

### III. Evidentiary Claims

**A. Cross-Examination of Hare About ICC's Alleged Violation of Provisions of the SEPTA Contract**

In its sixth, seventh, and eighth issues, ICC challenges the trial court's evidentiary rulings allowing Hare to be cross-examined about the company's alleged violations of certain provisions of the SEPTA contract. By way of background, we summarize the following. A "Contractor Integrity Provision" of the SEPTA contract prohibited ICC from having a financial interest in a subcontractor. Additionally, ICC was required to allocate at least fourteen percent of the total value of the contract with SEPTA to one or more DBEs,[11] owned by a woman or a person of a minority group.

At trial, Hernandez sought to cross-examine Hare regarding these provisions, and to elicit, specifically, testimony that: (1) Hare was also the owner of MSI, the subcontractor; and (2) MSI was the designated DBE subcontractor, but MSI was not in fact a minority-owned business because Hare is a Caucasian man.[12] ICC objected, arguing such evidence was not

---

[11] This provision applied only if ICC opted to engage any subcontractors; it did not apply if ICC did not hire any subcontractors. **See** N.T., 2/14/23 P.M, at 58. Furthermore, we note the total amount of the contract between ICC and SEPTA was $2,943,000. **See** N.T., 2/10/23 A.M., at 4.

[12] We reiterate that "MSI" stands for Minority Services, Inc.

relevant[13] to Hernandez's negligence claims at issue. *See* N.T., 2/14/23 P.M., at 33 (ICC's counsel arguing, "***Relevance***. We're talking about a train accident here. . . . [T]he business integrity [provision] has nothing to do with this case. And I don't understand why it's being shown") (emphasis added).

Over a lengthy sidebar discussion, Hernandez responded that evidence — that Hare signed the contract representing he would abide by certain provisions, but he ultimately did not — went directly to his truthfulness. N.T., 2/14/23 P.M., at 33-34. The trial court agreed, stating, at separate times: (1) "If you could show that a witness was not being truthful ***or was not credible when he did certain things*** in relation to the overall case, that's relevant to whether . . . the jury [will] believe other things that he said;" and (2) "[W]hen a witness testifies[,] the jury has to believe what he's saying. And if they could show that ***he was not credible at a certain point***, then that will go to his credibility." ***Id***. at 34, 35 (emphases added). ICC did not dispute these points, but instead continued to argue the evidence was not relevant. ***See id***. at 34 (ICC's counsel responding to the trial court, "[B]ut what does that have to do with the accident in question?," and "Yeah, but it has to be relevant to what we are talking about. This is not a breach of contract case"). The trial court ruled that Hernandez could ask the questions of Hare: "[T]hese questions were meant to demonstrate to the jury, subject

---

[13] Generally, evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 403(a)-(b).

to your questioning of this witness, that [Hare] *was less than truthful at various points in this contract*. Whether or not it had anything to do with the actual accident, to me . . . is not the crux of the question." *Id*. at 47.

On appeal, ICC avers the trial court erred in permitting Hernandez to cross-examine Hare about ICC's alleged breach of specific provisions of the contract with SEPTA. In support, ICC asserts that Pa.R.E. 608(b)[14] prohibits the introduction of specific instances of a witness' conduct to attack that witness' character or truthfulness. *See* ICC's Amended Brief at 42. Additionally, ICC alleges the trial court failed to perform the Pa.R.E. 403 balancing test of probative value and prejudice.[15] *See id*. at 43-44. To this

---

[14] Rule 608 provides, in pertinent part:

> (a) Reputation Evidence. A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked. . . .

> (b) Specific Instances of Conduct. Except as provided in Rule 609 (relating to evidence of conviction of crime),

> > (1) the character of a witness for truthfulness may not be attacked or supported by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct[.]

Pa.R.E. 608(a)-(b)(1).

[15] Rule 403 states: "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

end, ICC maintains that Hernandez's evidence improperly "suggest[ed] to the jury that ICC manipulated government set aside rules for DBEs and did not adhere to 'business integrity' requirements of the contract, to lead the jury to conclude that ICC was a bad actor." *Id*. at 45 (emphasis omitted).

We determine ICC has waived these discrete evidentiary theories, as it did not raise them before the trial court, and instead presents them for the first time on appeal. We consider: "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).

> [I]n order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error . . . will result in waiver of that issue. On appeal, the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected . . . . By specifically objecting to any obvious error, the trial court can quickly and easily correct the problem and prevent the need for a new trial. Additionally, the appellate court should not be required to waste judicial resources correcting a problem that the trial court could have easily corrected if it had been given the opportunity to avoid the necessity of granting a new trial.

*Tong-Summerford v. Abington Mem'l Hosp. & Radiology Grp. of Abington*, 190 A.3d 631, 645 (Pa. Super. 2018) (citations omitted). A claim is "waived when the appellant's argument on appeal advanced a different legal theory than that offered at trial and post-trial." *Ruff v. York Hosp.*, 257 A.3d 43, 52 (Pa. Super. 2021) (citation omitted).

Preliminarily, we note that although both parties filed motions *in limine* and the trial court conducted extensive hearings on them, neither party raised

the scope of cross-examination of **Hare** about his or ICC's compliance with the SEPTA contract provisions. **See** N.T., 2/2/23, at 3-45.

Additionally, at trial, ICC did not argue that Hernandez was prohibited from presenting specific instances of conduct in order to attack Hare's credibility or truthfulness. Indeed, both the trial court and Hernandez raised this issue. Hernandez argued he could present evidence that Hare signed the contract but failed to comply with it, and this "goes directly to his truthfulness." N.T., 2/14/23 P.M., at 33-34. The trial court ruled, similarly, that a party could present evidence that a witness was not truthful "when he did certain things" or "was not credible at a certain point." **Id**. at 34, 35. These statements go to a Rule 608(b) issue — whether Hernandez can present a specific instance of Hare's conduct to show his truthfulness. However, ICC did not dispute this reasoning, and instead argued another evidentiary theory: relevance. Similarly, ICC failed to preserve a claim that the trial court failed to perform the Pa.R.E. 403 balancing test of probative value and prejudice, or that the evidence was prejudicial.[16] Accordingly, ICC has waived all of these issues for our review. **See** Pa.R.A.P. 302(a); **see also Tong-Summerford**, 190 A.3d at 645.

---

[16] We note that at trial, ICC raised a prejudice argument concerning the admission of other evidence — the total value of the ICC-SEPTA contract. **See** N.T., 2/14/23 P.M., at 47-48. However, ICC did not argue prejudice with respect to the cross-examination of Hare regarding violations of the integrity and DBE contractual provisions.

For the foregoing reasons, no relief is due on ICC's sixth, seventh, and eighth issues.

### B. Testimony by Hernandez's Expert, DaSilva, Regarding ICC's Compliance with the SEPTA Contract

ICC's ninth claim is that the trial court abused its discretion in admitting the testimony of Hernandez's expert witness, Gustavo DaSilva ("DaSilva"), about the content of ICC's contract with SEPTA and the incorporation of specifications for the methods by which the trenching project was to be carried out.

"It is well-settled that '[e]videntiary rulings are committed to the sound discretion of the trial court, and will not be overruled absent an abuse of discretion or error of law.'" *Tillery v. Children's Hosp. of Phila.*, 156 A.3d 1233, 1243 (Pa. Super. 2017) (citation omitted). Generally, "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Evidence is relevant if it tends "to make a fact more or less probable" and "the fact is of consequence in determining the action." Pa.R.E. 401(a)-(b). Nevertheless, a trial "court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "Importantly, if a party presents evidence about a certain issue, then they open the door to rebuttal evidence that may not otherwise have been admissible." *Tillery*, 156 A.3d at 1243.

For ease of review, we review the relevant procedural history. ICC filed a motion *in limine* to preclude DaSilva from testifying as to whether ICC breached its contractual obligations to SEPTA. ICC argued such matters were irrelevant, collateral to the negligence claims that would go before the jury, and outside the witness' expertise. After a hearing, the trial court **granted** this motion. **See** N.T. 2/3/23, at 25-26; Trial Court Order, 2/3/23.

However, at trial, ICC asked DaSilva on cross-examination whether he knew if ICC had fulfilled the technical requirements of its earlier SEPTA contracts "back in 2008, 2011." N.T. Trial, 2/9/23 P.M., at 131. DaSilva did not answer, responding only that he failed to understand the question. **See id**. The trial court then permitted Hernandez to ask DaSilva about ICC's performance of its SEPTA contracts, finding that ICC had opened the door. The following exchange occurred:

> [Trial Court]: My [pretrial] ruling was — and you both argued, [Hernandez] and [ICC] argued very strenuously and I granted your motions — that [DaSilva] is not to mention the contract, nor is he to mention terms of a contract or breach of a contract.
>
> But you were the first one to bring up the fact that there was a contract between ICC and SEPTA. When you did it, I had proverbial jaw-drop, but you did it. And now I'm going to permit the plaintiff to ask the questions about the contract.
>
> * * * *
>
> Not to interpret the legalese of the contract, as [Hernandez's counsel] indicated, but the fact that there was an obligation under a contract to apply the —
>
> * * * *

- 29 -

— specifications that are attached [to the contract.[17]]

[ICC]: Your Honor, asking the witness as to when the contract was executed doesn't open the door, in my opinion . . . respectfully, for a witness to go unbridled into the contract terms.

[Trial Court: Hernandez's counsel] just said he's not going unbridled. But he's simply going to ask [DaSilva] about the contract that you brought up.

[ICC]: What are the specifics is he going to be asking . . . DaSilva about this contract?

[Trial Court]: I don't know. You want an offer of proof?

[ICC]: Yes, Your Honor.

[Hernandez]: There was a contract entered into March 8, 2018, signed off [by] Hare. And it says, "Contractor shall perform those services and supply those products described in the specifications which are attached hereto, and made part of the contract, and hereinafter called 'the work.'" And then the followup question of: And, sir, were those specifications in fact attached to the contract?

[ICC]: Okay. If that's it, those two questions, I'm fine.

[Trial Court]: Okay. We're good.

[Hernandez]: Okay.

*Id*. at 171-73.

---

[17] DaSilva testified that the contract between ICC and SEPTA, executed on March 8, 2018 and governing the trenching work that Hernandez performed, incorporated an attached section called, "Specifications." This section was a standalone document created on September 8, 2011, that was apparently incorporated on a regular basis into SEPTA's contracts for construction projects. The document outlined the specifications for trenching and support activities, including requirements for worker safety. DaSilva testified that these terms required ICC to object to the location of workers if it believed they were in danger. *See* N.T. Trial, 2/10/23 A.M., at 9-18.

On re-direct examination, Hernandez asked DaSilva to discuss specific provisions of the contract between ICC and SEPTA, which required the contractor for the trenching work to post watchpersons and protective barriers. *See* N.T., 2/10/23 A.M., at 14-20. DaSilva opined that watchperson services were not adequately carried out, and that the barriers required by the contract's "Specifications" provisions were not set up next to the trench where Hernandez was injured. *See id*. at 18-19.

After review of the record, we conclude the trial court did not abuse its discretion in finding ICC opened the door to DaSilva's testimony. *See Tillery*, 156 A.3d at 1243. When ICC asked DaSilva on cross-examination whether ICC had fulfilled the technical requirements of the SEPTA contract, this questioning opened the door for Hernandez to clarify for the jury what those requirements were. The fact that ICC's counsel questioned DaSilva about whether the requirements had been satisfied suggested to the jury that ICC's performance was relevant in the case. ICC could not have been prejudiced by Hernandez's counsel posing the same, or related, questions to the same witness. For the foregoing reasons, no relief is due on ICC's ninth issue.

## C. Remedial Measures

ICC's tenth claim concerns the trial court's admission of evidence that remedial measures were put into effect after Hernandez's accident. By way of background, we summarize that at trial, Hernandez presented evidence of remedial measures implemented after his accident. The measure, called "Rule

- 31 -

135," required trains to come to a full stop prior to reaching work areas near railings and trenches. *See* N.T. Trial, 2/7/23 A.M., at 25-27. Rule 135 had been effectuated at other jobsites, and thus it was a precaution was already known in SEPTA's industry. *See id*. ICC did not dispute the feasibility of Rule 135, but contended that its implementation could not be used to establish its liability. *See* N.T. Trial, 2/3/23 A.M., at 45-46. The trial court admitted the evidence, reasoning the remedial measures were taken only by SEPTA, and not ICC. *See* Trial Court Opinion, 12/19/23, at 25-26.

Pennsylvania Rule of Evidence 407 provides:

When measures are taken by a party that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is *not* admissible against that party to prove:

- negligence;

- culpable conduct;

- a defect in a product or its design; or

- a need for a warning or instruction.

But the court may admit this evidence for another purpose such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures.

Pa.R.E. 407 (emphasis added). "[T]he common law of Pennsylvania, like that of most other jurisdictions, embodies the common law 'subsequent repairs' doctrine, which excludes evidence of subsequent remedial measures, at least when such evidence is offered to establish fault or culpable conduct." *Duchess v. Langston Corp.*, 769 A.2d 1131, 1137 (Pa. 2001). Generally,

"the aim is to encourage measures that further necessary or added safety, or at least to avoid discouraging such measures, by removing the concern that they will be employed adversely in an action at law." **Id**. Additionally, this Court has considered "Rule 407's public policy rationale — that, in the modern marketplace, economic factors provide adequate motivation for mass producers to improve their defective products, such that the incentive provided by the exclusionary rule is unnecessary or irrelevant." **Id**. at 1139 (footnote omitted).

Furthermore, the comment to Pa.R.E. 407 explains that Pennsylvania's rule "has been modified [from its federal counterpart] to clarify that the **rule only protects the party that took the measures**." Pa.R.E. 407, *comment* (emphasis added). The comment provides that, even though the federal rule is silent as this point, federal "courts have generally held that the federal rule does not apply when one other than the alleged tortfeasor takes the action because the reason for the rule (to encourage remedial measures) is not then implicated." **Id.** (citation omitted).

After review of the record, we conclude the trial court did not abuse its discretion in admitting the evidence of SEPTA's subsequent remedial measures. **See Tillery**, 156 A.3d at 1243. ICC was not responsible for implementing the remedial measure; instead, it was SEPTA, a non-participant at trial. **See** Pa.R.E. 407, *comment*. Accordingly, Rule 407 affords ICC no relief, as the rule does not preclude the admission of subsequent remedial

measures against an individual **other** than the party who implemented them. **See id**.

Furthermore, we deny relief on ICC's argument regarding relevance. **See** Pa.R.E. 401(a)-(b) (stating "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence to the action"). ICC contends the trial court should have excluded evidence of remedial measures because, having been implemented by SEPTA, they were not relevant to ICC's liability.

We observe that SEPTA appeared on the jury's verdict slip despite not participating in the trial, and the jury apportioned a share of the liability for Hernandez's injuries to SEPTA. It was therefore relevant to the jury's deliberation whether SEPTA's knowledge of Rule 135, and its decision not to implement it at Hernandez's worksite, unreasonably exposed Hernandez to danger.

Although it is arguable whether ICC had the authority to independently implement Rule 135, Hernandez argued in closing that ICC was negligent in part due to SEPTA's failure to adopt the safety measure at the time of the accident.[18] Even assuming that the remedial measure was not relevant as to

---

[18] Hare testified that ICC was obligated to confer with SEPTA about the safety measures needed to protect MSI's trench workers. This arguably implies that ICC had some degree of responsibility for determining, or helping SEPTA to determine, which safety measures to implement at the worksite where Henandez was injured.

ICC, and that a cautionary instruction should have been given to that effect, we do not find that this entitles ICC to relief.

ICC's eleventh claim, in its statement of questions involved, is that the trial court erred in not giving the jury a cautionary instruction — that remedial measures were not relevant to the issue of whether ICC was liable for Hernandez's damages. ***See*** ICC's Brief at 4.

However, ICC has not included this claim in the argument section of its brief. It does not discuss why the trial court allegedly erred in denying a limiting instruction. Accordingly, this issue is waived for our review. ***See*** Pa.R.A.P. 2119(a) (providing "the particular point [shall be] followed by such discussion and citation of authorities as are deemed pertinent"); ***see also Trust Under Deed of Wallace F. Ott***, 271 A.3d 409, 421 (Pa. Super. 2021) (stating that "[w]e shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument," and "an appellant waives any issue he fails to develop sufficiently").

For the foregoing reasons, no relief is due on ICC's sixth and eleventh issues, relating to the admission of remedial measures.

### IV. Sufficiency of Standard of Care Evidence

ICC's final claim is that there was no proof of the applicable standard of care that ICC owed to Hernandez, and thus the trial evidence was insufficient to establish liability for Hernandez's damages. ICC avers that Hernandez had the burden of establishing the standard of care applicable to it, but Hernandez

failed to do so. ICC maintains that instead, Hernandez presented the testimony of DaSilva, who improperly equated ICC's duty of care with its contractual obligation to follow the work rules outlined in its SEPTA contract. *See* ICC's Brief at 53-54.

This Court has explained:

> In order to hold a defendant liable for negligence, the plaintiff must prove the following four elements: (1) a legally recognized duty that the defendant conform to a standard of care; (2) the defendant breached that duty; (3) causation between the conduct and the resulting injury; and (4) actual damage to the plaintiff.

***Nationwide Mutual Fire Ins. Co. v. Modern Gas***, 143 A.3d 412, 415 (Pa. Super. 2016) (citation omitted). "The existence of a duty is a question of law." ***Baumbach v. Lafayette College***, 272 A.3d 83, 89 (Pa. Super. 2022) (citations omitted and paragraph break added). "The mere fact that an accident occurred does not entitle the injured person to a verdict." ***Rauch v. Mike-Mayer***, 783 A.2d 815, 824 n.8 (Pa. Super. 2001).

Here, the trial court opinion explained that Hernandez's expert, DaSilva, gave competent expert testimony regarding the standard of care which ICC owed to Hernandez. *See* Trial Court Opinion, 12/19/23, at 26. DaSilva discussed his own qualifications, which included more than thirty years working in the railroad industry, and knowledge of the methods of protections afforded to workers. The trial court had ruled, without any objection, that he was qualified to testify as an expert on that subject. *See* N.T. Trial, 2/9/23 P.M., at 35-37.

DaSilva testified about ICC's responsibilities for worker safety under prevailing industry standards. While DaSilva discussed ICC's contractual responsibility to provide for the safety of workers by posting watchmen, he clearly indicated that ICC's contract with SEPTA mirrored standard industry practice. He did not, as ICC claims, simply conflate the contract with the applicable industry standards.

Further, DaSilva testified specifically that the industry standards and rules applicable to ICC's trenching project required the train tracks to be closed, and ICC to be responsible for the posting of watchpersons along the tracks. *See* N.T. Trial, 2/9/23 P.M., at 81. However, in DaSilva's opinion, ICC did not comply with its obligations under prevailing industry standards, because no ICC employees were onsite on the day of Hernandez's accident, and the tracks were not closed as trains approached the conduit trenches. *See id.* at 81-82. The trial court relied on this testimony in finding that the evidence of ICC's standard of care was legally sufficient, and we find no error in that ruling. *See* Trial Court Opinion, 12/19/23, at 26-27.

## V. Conclusion

In sum, we conclude that none of ICC's issues merit appellate relief. Accordingly, we affirm the judgment entered in favor of Hernandez.

Judgment affirmed.

President Judge Lazarus joins this Memorandum.

Judge Stabile files a Concurring and Dissenting Memorandum.

- 37 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>8/18/2025</u>